UNITED STATES of America, Plaintiff-Appellee,

v.

Paul RICE, Pedro Alvarez, John Leslie Wells, Jr., and Jerold Massler, Defendants-Appellants.

No. 76–2477.

United States Court of Appeals, Fifth Circuit.

April 20, 1977.

Rehearing and Rehearing En Banc Denied May 24, 1977.

Forrest E. Campbell, Greensboro, N. C., for Rice and Wells.

Herman I. Graber, Lynne Stewart, New York City, N. Y., Allen L. Jacobi, Coconut Grove, Fla., for Massler.

Bernard H. Dempsey, Jr., Robert A. Fraser, Tampa, Fla., for Alvarez.

John L. Briggs, U. S. Atty., Jacksonville, Fla., L. Eades Hogue, Special Atty., Tampa, Fla., Milton J. Carp, Dept. of Justice, for plaintiff-appellee.

Before JONES, COLEMAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

Along with others, Alvarez, Wells, Rice and Massler were charged in a one count indictment with conspiracy to import, possess and distribute marijuana, 21 U.S.C. §§ 841(a)(1), 952(a). A twelve day trial resulted in a guilty verdict. Alvarez received a three year sentence, Wells one year, while Rice and Massler were sentenced to two and one-half years.

We affirm.

## I. THE FACTS

The government's case depended, in the main, on the testimony of William Kilgore, an unindicted co-conspirator, in protective custody, who appeared under a grant of "informal" immunity.

### Kilgore's Testimony

Kilgore first met Alvarez in 1968 or 1969. In February, 1972, Alvarez hired Kilgore to guard a cache of marijuana located at "Stash House No. 1" in Odessa, Florida. For three weeks Kilgore was paid to guard the contraband, to weigh it for customers, and collect for it. Alvarez told Kilgore that the marijuana, stored in bales and burlap sacks, came from Colombia, South America.

Later on in February Alvarez took Kilgore to Mike Sarga's "Stash House No. 2", in the same vicinity, where he did similar work.

In March, Kilgore and Alvarez flew to New York. After arrival Kilgore went with Allen Jacobs to Woodstock to guard a stash house located there. Sarga and Massler soon drove up in a van with a boat on top. The boat contained 350 pounds of marijuana. The next day Alvarez directed Kilgore to let Jacobs and Massler have 100 pounds each, on consignment. Later, Alvarez directed Sarga and Kilgore to transfer the remainder of the marijuana to Massler in Manhattan. Kilgore stayed in New York about a week and collected $120,000 from Jacobs and Massler, owed Alvarez for the pot. Kilgore then returned to Tampa and turned the money over to Alvarez.

Around the first of April, Alvarez contacted Kilgore again and asked him if he would like to go to Colombia and guard a return load of marijuana. Kilgore was also to pay the Colombian connection, Pedro and Alberto Davilla. He was to fly down on a DC–3, piloted by Wells and Rice and was to be paid $5000 for his part in the trip. Alvarez drove Kilgore to the Hawaiian Village Motel where Kilgore met Rice and Wells. Rice there stated that Alvarez had paid $10,000 to rent the plane for a prior trip and had then bought the plane for $10,000. Rice and Wells related to Kilgore an account of a prior similar trip to Colombia on which Alvarez had accompanied them. Alvarez had also told Kilgore of the prior trip, saying that the marijuana at "Stash House No. 1" had been obtained at that time.

The next day Kilgore, Rice and Wells flew to a location south of Bogata, Colombia. Once there, the defendants gave the Colombians the money and certain other items and loaded 3500 pounds of marijuana on the plane.

On return to the United States, they landed first at Lakeland, then returned to Zephyrhills. Once they landed, Alvarez and two others arrived in a Winnebago, into which they loaded the marijuana. From there, the party went to a house in Riverview and distributed part of the marijuana.

Subsequently, Alvarez again contacted Kilgore and asked him if he'd like to make a second trip to Colombia.. A couple of weeks later, Alvarez approached Kilgore about making another trip to New York to collect money from Massler. Kilgore made this trip around the end of April, 1972, but returned to Tampa without the money. Massler followed a few days later and paid Alvarez in excess of $100,000.

Kilgore's testimony was supported by other items of evidence adduced by the government. Much of the conspiratorial activities had been recorded on film. One of the defendants had taken several hundred photos of the operation. Negatives of these photographs were volunteered to the law enforcement officers by the manager of

the photography department at J. C. Penney's, who discovered the contents by chance.

The manager of the Hawaiian Village Motel corroborated Kilgore's account of the stay at that motel, although his testimony did differ in some aspects.

Lastly, one Porter reluctantly testified that Rice discussed with him the possibility of using one of Porter's airplanes for importing marijuana, that Rice leased a Douglas DC–3, and Wells had signed the agreement as a witness. He stated that sometime in April, 1972, he sold the craft to Rice and Wells. Porter once saw Rice and several other individuals unloading several dark, big, square parcels from the plane. He also saw a late night operation in April or May of 1972, in which a DC–3 landed, a vehicle approached the plane, there was activity around the plane, and the vehicle left. Additionally, Porter testified that Rice and Wells made inquiries of him as to how to arrange additional fuel sources for the DC–3.

This array of evidence, accepted by the jury as being true beyond a reasonable doubt, reduces the appellants to a many sided attack on various aspects of the trial.

## II. APPELLATE CONTENTIONS

### A. *Massler, Alvarez, Wells, and Rice*

#### 1. *Pre-Indictment Delay*

There was a three and one-half year delay between the close of the alleged criminal activities and the return of the indictment. It is argued that this unconstitutionally prejudiced the defense and that by not holding an evidentiary hearing to determine the cause for the delay the District Court reversibly erred.

The defendants complained generally that due to the delay, possible witnesses were either "unremembered or unavailable", that the delay severely prejudiced the defense, and that it was intended to give the government a tactical advantage over the defendants, that is, to enable the government to procure evidence of subse-

quent criminal acts of *some* co-defendants to bolster the prosecution of *all.*

No such later acquired evidence was ever offered against any of the defendants. No list of unavailable witnesses was tendered, nor was there any recitation of any exculpatory testimony thus put beyond the reach of the defense.

■ The Supreme Court has held that the applicable statute of limitations is the primary, but not the sole, guarantee against the bringing of overly stale criminal charges; that one seeking to establish impermissible indictment delay under the Due Process Clause must show substantial actual prejudice resulting from the delay or that the delay was an intentional measure designed to gain a tactical advantage for the prosecution. Absent such a showing no Constitutional violation has been inflicted and the indictment need not be dismissed. See *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The Sixth Amendment right to speedy trial arises only when a defendant becomes an accused, either through arrest, indictment, or information. See *United States v. Marion, supra; United States v. Harrington,* 5 Cir. 1976, 543 F.2d 1151; *United States v. Davis,* 5 Cir. 1973, 487 F.2d 112, 116, *cert. den.,* 1974, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878; *United States v. Broadway,* 5 Cir. 1973, 477 F.2d 991, 996.

■ *Speculative assertions,* such as allegations of lost witnesses, ensuing indigency, failure of memory, and general inability to defend oneself due to the delay, fall short of the *Marion* standard, *United States v. Butts,* 5 Cir. 1975, 524 F.2d 975, 977; *United States v. McGough,* 5 Cir. 1975, 510 F.2d 598, 604; *United States v. Broadway,* 5 Cir. 1973, 477 F.2d 991.

■ An evaluation of this appellate record in the light of the foregoing considerations shrinks the complaint about pre-indictment delay to nothing more than a complaint. There was no showing of actual prejudice. The contention fell so far short of *Marion* standards and our own decisions on the subject that it was without substance. The denial of an evidentiary hearing on the matter was not erroneous.

2. *Severance*

Various motions for severance were grounded on an expressed desire to call one co-defendant or another as a witness on behalf of the respective movants.

■ In our previous decisions we have clearly delineated what must be shown to warrant granting a motion to sever under the circumstances present here. The movant must demonstrate:

(1) bona fide need for the testimony;

(2) the substance of the desired testimony;

(3) its exculpatory nature and effect; and

(4) that the designated co-defendant will *in fact* testify at a separate trial.

*United States v. Morrow,* 5 Cir. 1976, 537 F.2d 120, 135; *United States v. Diez,* 5 Cir. 1975, 515 F.2d 892, 903, *cert. den.* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976); *United States v. Burke,* 5 Cir. 1974, 495 F.2d 1226, 1234; *United States v. Martinez,* 5 Cir. 1973, 486 F.2d 15, 22; *Byrd v. Wainwright,* 5 Cir. 1970, 428 F.2d 1017, 1019–1022.

The trial court should

(1) examine the significance of the alleged exculpatory testimony in relation to the defendants' theory of defense;

(2) assess the extent to which the defendant might be prejudiced by the absence of the testimony;

(3) pay close attention to judicial administration and economy; and

(4) give weight to the timeliness of the motion.

*Id.*

■ Massler moved pretrial for a severance predicated on Rule 14, Fed.R.Crim.P.[1]

---

1. Rule 14 provides:

 *Relief from Prejudicial Joinder*

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of

He asserted that while co-defendant Alvarez would not testify in his behalf at a joint trial he would do so if there was a severance. The motion stated:

> In the instant case, Pedro Alvarez has stated, and he will so depose if requested, that if called at a separate trial where he will not need to exercise a Fifth Amendment privilege, he will and can give evidence that will exonerate Jerrold Massler completely. If tried jointly, Mr. Alvarez will, of course, not testify.

This motion did not state what Alvarez would, in fact, testify to. Whatever the testimony, it was contingent upon Alvarez not being required to testify to anything which might tend to incriminate him.

The denial of the motion in this form was not error.

When trial day came Massler renewed his motion. Other defendants decided that they would attempt to board the same train. Alvarez indicated that he wanted to call Massler as a witness. Wells said that he desired to call one or more of the co-defendants as his witnesses.

■ Alvarez told the Court that he planned to call Massler as his first witness. He stated that he would prove by Massler that Massler was in jail in the latter part of April, 1972, contradicting the testimony of Kilgore that he met Massler in Tampa in late April. If Massler was in jail in late April there should have been records to prove it without the necessity of calling Massler to the stand. Massler's attorney stated that his client would be willing to testify if "he could no longer be prosecuted for the events contained within this indictment", which amounted to nothing more than a suggestion that Massler would testify on his own terms, a grant of immunity from prosecution. The denial of Alvarez's motion was entirely in order.

Later in the trial, Massler's attorney told the Court that he wanted to call Alvarez as a witness. He stated that Alvarez would testify that he never received $200,000 from Massler as Kilgore testified, "and that he would exculpate my client in terms of this particular conspiracy". It was stated that Alvarez would not testify as a defendant but he would testify in a separate proceeding where his guilt or innocence was not on the line.

■ During the same conference, Rice's attorney stated that he wanted to call Massler as a witness. He stated that Massler would testify that "he was not acquainted with my client during the period of time alleged in the conspiracy". Here it is to be noted that the government never claimed that Massler had any contact with Rice. Rice dealt with Alvarez.

■ Wells' attorney informed the Court that he desired to call Alvarez to testify as to the factual setting for two photographs depicting Wells and Alvarez in an airplane. This testimony would have been that the picture depicted a legitimate charter flight on which Alvarez hired Wells to fly him to the Bahamas. Wells' attorney stated that "that would be all I would ask Mr. Alvarez concerning his relationship with Mr. Wells. I think it is highly probative." It was stated that Alvarez would testify in a proceeding where his guilt or innocence was not being determined.

Some of the motions were not made until the eleventh day of a twelve day trial.

For lack of any reasonable certainty that the proposed witnesses would, in fact, testify; for lack of relevance; for lack of the requisite exculpatory showing; and for lack of timeliness, we hold that the defendants were not prejudiced by the denial of the severally requested severances. The denials did not amount to reversible error.

defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at trial.

### 3. Cross Examination

The appellants complain of being prohibited "from cross-examining Kilgore about his protected custody over a five month period and his activities during that time". The Court ruled:

> [N]o one shall seek to elicit from the witness that he is in protective custody as a result of any specific fear of harm at the hands of the defendant Alvarez . . .

> * * * * * *

> [T]he Court will direct counsel not to make inquiry as to the precise nature of the witness' present employment.

The Court specifically informed counsel, however, that they could inquire as to the fact that Kilgore was in protective custody, whether he was receiving payments from the government, whether he was gainfully employed, and what income he had. Counsel for Massler replied that he had no desire to find out where Kilgore was working or living.

 Although generally there is a right to inquire into a witness's background and environment in order to place the witness in his proper setting, *Alford v. United States,* 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931), there are limitations. As *Alford* recognizes,

> There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him.

*Id.* 282 U.S. at 694, 51 S.Ct. at 220.

In *Smith v. Illinois,* 390 U.S. 129, 133–134, 88 S.Ct. 748, 751, 19 L.Ed.2d 956 (1968), Mr. Justice White, concurring, stated that in addition to those exceptions noted in *Alford,* he "would place in the same category those inquiries which tend to endanger the personal safety of the witness". We have followed this exception. See *United States v. Alston,* 5 Cir. 1972, 460 F.2d 48, and *United States v. McKinley,* 5 Cir. 1974, 493 F.2d 547.

While maintaining a due regard for the constitutional right of confrontation, "the scope and extent of cross-examination is generally declared to be within the sound discretion of the trial court" and will not be interfered with absent an abuse of that discretion. *United States v. Brown,* 5 Cir. 1977, 546 F.2d 166, 169; *Grant v. United States,* 5 Cir. 1966, 368 F.2d 658, 661. Of course, when it is the "star" witness who is being cross-examined, or when he was "an accomplice or participant in the crime for which the defendant is being prosecuted, the importance of cross-examination is necessarily magnified". *United States v. Brown, supra,* 546 F.2d at 170; *Beaudine v. United States,* 5 Cir. 1966, 368 F.2d 417, 424.

 At an *in camera* conference the government informed the Court that any inquiry into the nature of Kilgore's work would readily reveal where he was working and would endanger him. We have no transcript of what occurred at the hearing but we have no difficulty in perceiving, viewing the record as a whole, that there was a reasonable necessity for not revealing where Kilgore lived and worked when the case came to trial. That he was in protective custody was revealed.

The defendants also complain of being prohibited from asking Kilgore the circumstances surrounding his discharge from the military, certain aspects concerning an arrest for possession of heroin in 1973, and questions concerning trips by him to New York and to Miami.

We have looked carefully at the numerous evidentiary exceptions raised by appellants but the totality of the matter is that Kilgore was subjected for several days to rigorous cross examination, which developed many facts which might have discredited his testimony on direct. We conclude that there was no transgression of Sixth Amendment rights. See, in particular, *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

### 4. Rule 404(b)

Kilgore testified that he knew Alvarez and pointed him out in court. He said he first met Alvarez in 1968 or 1969.

The government admitted that it knew what the answer was going to be when it thereafter asked Kilgore the following question:

"Sir, what association, if any, did you have with Mr. Alvarez once you all met?"

There was an objection that any relationship prior to the inception of the conspiracy on January 1, 1972, was irrelevant and immaterial. Defense counsel pointed out that Kilgore "says he knows him". The objection was overruled on the ground that the jury would be instructed as to the time period charged in the indictment and that the relationship prior to that time "could be relevant with respect to the state of mind, or behaviour of the subject in explaining whatever he says explains subsequently of himself of the defendant".

Kilgore then responded, "We used to trade guns for dope and—".

The defense then moved for a mistrial.

There was a protracted conference in the absence of the jury. The government said that the proof was offered to show that this prior association was what prompted Alvarez to trust Kilgore with guarding the marijuana and collecting for it.

The prosecution further proffered that when Kilgore said "dope", he was referring to marijuana. The Judge asked Kilgore what he meant and Kilgore replied "marijuana and hashish". After this lengthy discussion, the Court determined that the statement was admissible under 404(b) of the Federal Rules of Evidence.

Once the jury returned, Kilgore testified what he meant by the word "dope". The Judge instructed the jury that Kilgore's statement should be considered *only with respect to Alvarez* and the statement should "receive only such weight as you may think it entitled to receive in relation to all of the other testimony and evidence" adduced at trial.

Rule 404(b) provides:

*Other crimes, wrongs, or acts.*

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have recently analyzed this rule in *United States v. Bloom*, 5 Cir. 1976, 538 F.2d 704. Noting that it coincides with existing case law in this Circuit, *Id.* at 708, we stated that, "evidence of acts extrinsic to the crime charged is admissible under the itemized exceptions once the trial court is satisfied that certain threshold prerequisites have been met". *Id.* at 708. These prerequisites are:

(1). Proof of the prior *similar* offenses must be "plain, clear and convincing";

(2). The offenses must not be too remote in time to the alleged crime;

(3). The element of the prior crime for which there is a recognized exception to the general rule, such as intent, must be a material issue in the instant case;

(4). There must be a substantial need for the probative value of the evidence provided for by the prior crimes.

*Id.* at 708 (emphasis in original).

Without commenting on the first three criteria, we feel it is clear that the disputed statement fails to pass criterion number four. There was *no* need for the evidence in the form rendered. Kilgore had stated that he had known Alvarez since 1968 or 1969 and had pointed him out in court. Any need for evidence to establish the manner in which Kilgore and Alvarez met could have been accomplished without mentioning "trading guns". The government's deliberate interjection of this testimony exhibits lack of the appropriate sensitivity to the defendants' substantive rights. We expressly disapprove it.

Nevertheless, we are convinced that the error was harmless beyond a reasonable doubt. The evidence of defendants' guilt was abundant; the trial lasted twelve days; fourteen witnesses were heard. We are persuaded, therefore, that this one statement in such a massive trial could not have possibly influenced the jury to reach an improper verdict.

In *United States v. Resnick*, 5 Cir. 1974, 488 F.2d 1165, *cert. den.*, 416 U.S. 991, 94 S.Ct. 2400, 40 L.Ed.2d 769, the defendant was charged with selling firearms to non-residents and failing to keep appropriate firearms transaction records. An A.T.F. agent testified to certain unrelated criminal activity, namely that the defendant dealt in stolen guns and participated in the unlawful alteration of semi-automatic weapons to fully automatic ones. Defense counsel moved for a mistrial, which was denied. The trial court stated that it would instruct the jury to disregard the tainted testimony. The District Court, however, did not give the promised curative instructions. Further, at the post-instruction conference, defendant's attorney stated that he had no objections to the charges given.

In holding that the error was harmless, we said:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and judgment should stand. . . ."
>
> *Kotteakos v. United States*, 1946, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557; F.R.Crim.P. 52(a). In the circumstances of this case, we are convinced that the substantial rights of Resnick were not affected.
>
> "[W]e have carefully canvassed the entire record and transcript, and are convinced that no prejudice resulted in any wise affecting the verdict of the jury. The evidence of defendant's guilt is strong, clear and convincing beyond question."

*Id.* at 1168.

*See also United States v. Beasley*, 5 Cir. 1977, 545 F.2d 403; *United States v. Bloom, supra; United States v. Barnett*, 5 Cir. 1974, 492 F.2d 790; *United States v. Harbolt*, 5 Cir. 1974, 491 F.2d 78; *United States v. Roland*, 5 Cir. 1971, 449 F.2d 1281.

As in *Resnick, supra*, the District Court herein specifically asked counsel for Alvarez if he desired an instruction relating to the disputed statement, stating that it would be willing to give a limiting instruc-tion if one was requested. Counsel for Alvarez declined the offer.

In view of the instructions as to the other defendants given at the time the statement was admitted, it was not error to deny a mistrial as to them. *United States v. Davis*, 5 Cir. 1977, 546 F.2d 617, 620.

## III. ALVAREZ, WELLS, AND RICE

### 1. *Massler's Exhibit No. One*

While Kilgore was being cross-examined, the government turned over to the defendants a hand-written statement, prepared by Kilgore at an undetermined date, which was a summary of the events to which he had testified. The statement related various aspects of the conspiratorial operations. Massler's name did not appear in the account but the names of the other defendants were included.

Alvarez had the exhibit marked for identification and cross-examined Kilgore about it, as did Massler's attorney. Several days later, Massler informed the Court that he intended to offer Kilgore's written statement into evidence as exculpating Massler by failure to mention his name. The Court reserved its ruling. After several discussions about the admissibility of the exhibit, the government withdrew its objections and the statement was admitted, albeit over the objections of the remaining defendants.

Three questions were raised by these defendants with regard to the admission of this evidence:

(A) Whether, in fact, it was admissible;

(B) Whether the Court erred in not giving instructions to the jury as to its use, limitations, and significance; and

(C) Whether the Court erred in denying Alvarez's, Wells', and Rice's motions for severance after the document was admitted.

In admitting "Massler's Exhibit No. One", the Court stated that it was allowing it in under 613(b) Fed.R.Evid. because of its inconsistency with portions of Kilgore's testimony, because Kilgore had been cross-ex-

amined at length concerning the exhibit, and because the government objections to its introductions had been withdrawn.

Rule 613(b) provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

■ This rule establishes three criteria which must be met before the statement is admissible:

(1) It must be a prior inconsistent statement of the witness;

(2) The witness must be afforded an opportunity to explain or deny the statement; and

(3) The opposing party must be afforded an opportunity to interrogate the witness concerning the statement.

All three elements are present here.

■ Defendants complain that no limiting instruction was given and, that under our previous decisions, this was error. *See United States v. Sisto,* 5 Cir. 1976, 534 F.2d 616; *United States v. Garcia,* 5 Cir. 1976, 530 F.2d 650; *Slade v. United States,* 5 Cir. 1959, 267 F.2d 834.

The fact is that a limiting instruction *was* given. The Court told the jury:

The testimony of a witness may be discredited or impeached by showing that he previously made statements which are inconsistent with his present testimony. *The earlier contradictory statements are admissible only to impeach the credibility of the witness and not to establish the truth of these statements.* (Emphasis added.)

The Court then instructed the jury on the effect of impeachment through such statements.

■ Denying the severance requested by the other defendants was not error.

*United States v. Maddox,* 5 Cir. 1974, 492 F.2d 104, 108, *cert. den.* 419 U.S. 851, 95 S.Ct. 92, 42 L.Ed.2d 82 (1974); *United States v. Johnson,* 5 Cir. 1973, 478 F.2d 1129, 1131, n. 3; *United States v. Harris,* 5 Cir. 1972, 458 F.2d 670, 673, *cert. den.* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972); *United States v. Levrie,* 5 Cir. 1971, 445 F.2d 429, 431; *James v. United States,* 5 Cir. 1969, 416 F.2d 467, 475.

### 2. *Witness Interview*

■ The defendants urge that the District Court erred by refusing to compel Kilgore to submit to an interview by defense counsel. As the result of a motion by the defendants, the government made Kilgore available to the defendants for an interview. Kilgore, however, refused to answer any questions about the case. Both before and during trial, the District Court interviewed Kilgore concerning his refusal to talk with defense counsel. There is no indication that the government was responsible for Kilgore's attitude. To the contrary, Kilgore told the Court that the government had told him that he could talk to defense counsel and that the matter was strictly up to him. All that a defendant is entitled to is *access* to a prospective witness. This right, however, exists co-equally with the witnesses' right to refuse to say anything. *United States v. Dryden,* 5 Cir. 1970, 423 F.2d 1175, 1177, *cert. den.* 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). "A government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so." *United States v. Benson,* 5 Cir. 1974, 495 F.2d 475, 479.

## IV. MASSLER

### *Inquiry by Jury*

After one hour of deliberation, the jury sent the Court a written message requesting "all transcripts now available in written form". The Court discussed how it planned to handle the request and there was no objection. The jurors were called back and the Court advised them:

Now if you do have, or if you should have during your deliberation some particular or narrow question, so-to-speak with respect to an item, or items of testimony you, of course, may request it in a written message . . . and I will give consideration to that. . . . But, in all events, a broad request such as you have made here for all available transcripts cannot be granted by me under prevailing policy and rules, and I trust you will understand that.

No objections were made at this time either.

 The discretion of the trial judge in ruling on jury requests of this nature is broad, *see, e. g., Government of the Canal Zone v. Scott*, 5 Cir. 1974, 502 F.2d 566; *United States v. Braxton*, 5 Cir. 1969, 417 F.2d 878; *Pinckney v. United States*, 5 Cir. 1965, 352 F.2d 69.

In *United States v. Morrow*, 5 Cir. 1976, 537 F.2d 120, 148, we held that the trial court did not abuse its discretion in denying the jury's request for over 300 pages of transcript. We stated: "The possibility of undue emphasis by the jury on a small part of the testimony given in the six week trial of this case amply justified the district court's denial of the jury request." *Id.* at 148.

 The jury's request herein could conceivably have meant the transmittal to them of over 2000 pages of transcript. There was no abuse in denying that request.

## V. OTHER ASSERTED ERRORS

In addition to the points hereinabove discussed, the appellants claim errors as to alleged *Bruton* rights, that they were prosecuted for a multiple conspiracy, that they were improperly denied an opportunity to take the deposition of two Colombian nationals in Colombia, that they were erroneously denied an opportunity to attack the reliability of certain photographic evidence, that the evidence was insufficient to support Rice's conviction, that the trial judge displayed improper irritation with the witness Porter, and that the jury was not fully instructed as to the testimony of accomplices. They also complain of the differences in the sentences imposed on the several defendants.

A searching evaluation of these contentions reveals their lack of merit. We see no benefit to be had by unnecessarily prolonging this opinion with an extended discussion of these matters.

## CONCLUSION

The record in this appeal reveals that the appellants were bereft of a defense on the facts. Accordingly, defense counsel retreated to the only hope left—an able, ingenious, persistent attack on trial procedures. They are to be complimented for their efforts, but the convictions must stand unreversed.

AFFIRMED.