UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald J. MARINO and Harvey Brower,
Defendants-Appellants.

No. 79–5420.

United States Court of Appeals,
Fifth Circuit.

May 12, 1980.

Rehearing and Rehearing En Banc
Denied June 6, 1980.

Joseph L. DeCaporale, Jr., Providence, R.I. (Court-appointed), for Marino.

John F. Cicilline, Providence, R.I., Fletcher N. Baldwin, Gainesville, Fla., for Brower.

Dosite H. Perkins, Jr., Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before TUTTLE, AINSWORTH and SAM D. JOHNSON, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by Marino and Brower from their conviction for unlawfully conspiring to aid and abet the crime of bail jumping under 18 U.S.C. §§ 371 and 3150.

The only substantial issue on this appeal is whether there was sufficient evidence of Brower's participation in the crime to warrant submission of his case to the jury. Other questions, involving both Brower and Marino, will also be dealt with.

Brower was a lawyer who lived and practiced in Lawrence, Massachusetts. Marino was an investigator who worked out of his office. When one James Graves was on trial in the United States District Court in the Western District of Louisiana for the offense of embezzlement from a national bank, 18 U.S.C. § 656, he was represented by a local lawyer named Reynolds. Shortly before the trial, Brower, apparently satisfying Reynolds that he represented Graves, appeared in Shreveport in company of Marino to assist in preparation for the trial. Brower did not stay through the trial, but Marino did. Reynolds conducted the trial which resulted in a conviction; he then handled the appeal to the Court of Appeals for the Fifth Circuit, which affirmed the conviction; the mandate was sent to the district court and Graves was directed to surrender for the commencement of his prison term on June 13, 1975. Reynolds and Brower together prepared the necessary papers to obtain a 15 day delay for Graves' surrender. However, before this was done, Reynolds represented to Brower that he was not being paid his fees for representing Graves in the embezzlement trial and several other criminal charges against him. Brower then told Reynolds that he "would seek or try to help Mr. Graves raise the capital to finance the subsequent proceedings." In response to the question whether Brower indicated that Reynolds would receive his fee, Reynolds responded: "Yes."

After Reynolds testified to these facts, Graves took the witness stand for the prosecution. He testified that he had been engaged with several other people in selling counterfeit bonds. The bonds identified by Graves were counterfeited by one Robert Sproul of Massachusetts who testified that he delivered them to Marino. When asked how he was to be compensated for his role in this bond venture, Sproul testified: "I was supposed to get some proceeds of the funds and legal representation if anything happened." He was then asked: "And was this legal representation supposed to be free?", to which Sproul answered: "Yes, sir," that he was to be represented by Harvey Brower. He testified that subsequently he was represented by Brower and that he later obtained some hundred dollar bills when he visited Brower's office with Marino who received an envelope with money in it from a secretary there.

Graves testified that the last time he saw Brower before he left the United States at the end of June 1975, was at the airport in New Orleans with Marino. Because of the critical nature of the evidence dealing with this meeting in our consideration of Brower's contention, it is necessary to quote it in detail. The following questions and answers dealt with this situation:

Q: Mr. Graves, what was your purpose in meeting Mr. Marino and Mr. Brower at the New Orleans Airport?

A: We would discuss my case that was on appeal and I would pass on proceeds from the bond sales at that time.

Q: And what discussions did you have with them concerning your conviction?

A: That Mr. Brower was going to represent me if I lost it in the Appeals Court—I mean the lower court and the Supreme Court.

Q: And what other discussions, if any, did you have concerning what would happen if your conviction was affirmed?

MR. CICILLINE: Objection.

THE COURT: I had better have you—

MR. CICILLINE: The witness has already answered the question. He keeps attempting to impeach the witness.

THE COURT: I don't think that was —overruled.

Q: Would you answer the question, Mr. Graves. Did you have any other discussions with Mr. Brower and Mr. Marino at the New Orleans Airport?

A: I let is be known that I wasn't going to prison.

Q: And what, if anything, was their response to that statement by you?

A: I asked Mr. Marino for a favor earlier and he wanted to know what it was and I told him that if I lost that I was going to leave and I asked him would he help me and he said he would.

Q: And what kind of help did you ask for?

A: I needed a passport and I needed employment wherever I was going.

Q: And did he—and what, if anything, did he offer to do for you in that regard?

MR. DECAPORALE: Objection

THE COURT: Overruled.

A: He said he would do it for me. He would help me get a passport and help me get employment.

Q: Did you go into any discussion with respect to the nature of the passport he would get you?

A: Yes, sir. I was to get some pictures made and send them to him, passport pictures. And he was going to get a valid passport and put my picture on it.

Q: Was any name mentioned regarding the passport, whose name it would be in?

A: Anthony Cimino, Cimino.

Q: Did he say who Anthony Cimino was?

A: He said he was a client of Mr. Brower's.

Q: And where were you to send the passport photographs?

A: To Mr. Brower's law office address in Massachusetts.

Q: And had you sent materials to Mr. Brower's office address before?

A: Yes, sir.

Q: And what had you sent there?

A: I sent letters, I sent legal papers, and I sent proceeds from the bond sales.

Q: What was the purpose of including— what was the purpose of the legal papers you sent?

A: I put them in the package with the money so if they were intercepted by Federal agents that I could claim attorney-client relationship.

Q: Did you do that on your own or on someone else's suggestion?

MR. CICILLINE: Objection.

THE COURT: Overruled.

A: Mr. Marino and I discussed that earlier to do it.

Q: And what was that discussion?

A: To place the legal documents, the legal papers with the money so to create a—cloud the issue if we got caught.

Q: How did you maintain contact with Mr. Marino and Mr. Brower during this period?

A: Usually it was a prearranged telephone call between Mr. Marino and myself on payphones. But if I needed to get in touch with him I would

call Mr. Brower and tell him I needed to talk with Mr. Marino and have him at his office and I would call back.

Q: And where would you make the telephone calls from?

A: Payphone stations.

Q: And over what period of time did you make those calls?

A: '74 and '75.

Q: And when you called Mr. Brower's office how did you identify yourself?

A: I would identify myself as Jim, or Jim the friend from down South.

Q: And was the telephone you were calling—you say in Massachusetts?

A: Yes, sir.

Q: Do you know where in Massachusetts?

A: Lawrence, Massachusetts.

Following his testimony concerning this meeting, Graves testified that he had met Marino alone shortly before he left for Mexico and further discussed the obtaining of the passport, and he testified further that Marino met him at Acapulco, Mexico in July at which time he gave Marino a check for $70,000 of the total proceeds of $145,000 from a pledging of counterfeit bonds with a Jackson, Mississippi bank. The check given to Marino was on a bank in the Grand Cayman Islands where Graves testified he had opened an account.

Further testimony was to the effect that Graves called Brower's office in Lawrence, Massachusetts several times to get in touch with Marino, and messages were delivered to Marino to call Graves back. There was also testimony to the effect that Marino asked Graves to call Brower and talk to him on the phone in a conversation which Brower would have taped.

Graves testified that he had passport pictures made and mailed them "to Mr. Harvey Brower's law office in Lawrence, Massachusetts." He stated that he was unable to get the passport before leaving for Mexico but that Marino said he would bring the passport to him there and would introduce him to "some people so I could get a job."

Further evidence from which the government contends that the jury could infer Brower's participation in the conspiracy must also be reproduced as it occurred in court:

Q: How many times did you talk with Mr. Brower after you were in Mexico?

A: Several.

Q: All right. When did you first talk with Mr. Brower?

A: The specific date?

Q: Well, roughly, yes.

A: The latter part of July.

Q: And what did you discuss with Mr. Brower in that telephone conversation?

A: I asked him had he heard from my family and he said he had got a phone call from a lady who said it was my wife, and that he didn't know whether it was or not, he thought it might have been an agent or something. He told her he didn't know where I was at. He told me that—I asked him was there very much heat. And he said yes, but he could handle it. I told him I needed to speak to Mr. Marino, to get him to the phone at a certain time and I would call back.

Q: And did you call back?

A: Yes, sir.

Q: Did you talk with Mr. Marino?

A: Yes, sir.

Q: And what was the content of that conversation?

A: Basically the same things, if he had checked out my family; to see if— what about the job I was supposed to get.

Q: Now, did you have any further conversations with Mr. Brower?

A: Yes, sir. I called him—I called him another time.

Q: All right, and what time was that?

A: That was about a day or so later that I called.

Q: And what was the nature of that telephone call?

A: He asked me some very personal and pertinent questions and was going to tape my conversation.

. . . . .

BY MR. McMILLAN (United States Attorney):

Q: Mr. Graves, was the second telephone conversation with Mr. Brower prearranged?

A: Yes, sir. The second one or third one. I didn't keep—

Q: All right, the taped conversation?

A: Yes, sir.

Q: And how was it prearranged?

A: Mr. Marino asked me to make the phone call.

Q: Do you recall specifically what Mr. Marino asked you to do?

A: He told me that he wanted me to call Harvey, that he had a lot of heat on him, and Harvey was going to tape it, he was going to ask me some questions, and, he said, you know how to answer it.

Q: And it was in response to that conversation that you called Mr. Brower?

A: Yes, sir.

Q: He asked me where I was and I told him that I wasn't going to tell him. And he asked me was I coming back and I told him no. He said—he informed me at that time that it was my constitutional right to appeal to the Supreme Court, as everybody else's, if I wanted to, but they would not hear it as long as I was on fugitive status; that is,—I don't know—I remember those. I don't remember exactly all of the questions. It has been a long time.

In light of the foregoing testimony involving Brower, the jury could properly infer that there was an ongoing course of criminal conduct involving the sale of counterfeit bonds, the center of which operation was the office of Harvey Brower in Law-

rence, Massachusetts; that proceeds from the sale of the bonds were delivered to Brower in New Orleans and, subsequently, to his office in Lawrence. No effort was made by defense counsel, either by voir dire or by cross examination, to raise an inference that Brower was not close enough to be an actual participant in the conversations with Marino at the New Orleans Airport or that the envelope of money delivered by Brower's secretary in Lawrence was addressed to Marino or that it had come from any source outside of Brower's own funds. We know that Marino was given an envelope by a secretary in Brower's office with hundred dollar bills in it and that he gave some of this money to the counterfeiter. The jury could also infer from Graves' testimony that he "sent letters, sent legal papers, sent proceeds from the bond sales 'so if they were intercepted by federal agents that I could claim attorney-client relationship' ", that there was no attorney-client relationship between Graves and Brower, also the jury could infer from Brower's assurance to Reynolds that he would help Graves "raise the capital" to finance the subsequent proceedings; that Brower was a part of the on-going conspiracy.

There was further evidence to the effect that a shipment of counterfeit bonds was made from Lawrence to a post office box in Louisiana rented by Graves at Marino's request; that they were used to obtain $145,-000, after Graves had left for Mexico. Marino received $70,000 from this deal.

This Court has repeatedly set down the test for sufficiency of proof on a motion for judgment of acquittal, and on review of the denial of such a motion, as being "whether the jury might reasonably conclude that the evidence, viewed in the light most favorable to the prosecution, is inconsistent with every reasonable hypothesis of the accused's innocence," citing *United States v. Barrera*, 547 F.2d 1250, 1255 (5th Cir. 1977); *United States v. Warner*, 441 F.2d 821, 825 (5th Cir. 1971), *cert. denied* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

■ The proof which we have outlined above clearly met this standard. We think it could hardly be argued otherwise. This test must be applied to each element of proof in a conspiracy trial. *Barrera, supra,* at 1255. Both appellants, however, claim that the trial court erred in not excluding all evidence relating to the counterfeit bond deal on the trial of Brower and Marino. Marino contends that the trial court abused its discretion under Rule 403 of the Federal Rules of Evidence in not excluding the evidence concerning the bond fraud, a substantial part of which has been outlined above. While not arguing this point in his brief here, Brower says error resulted when the trial court not only permitted oral testimony with respect to these matters but also covered some of them separately by permitting the government to introduce a stipulation entered into at the time of the first trial which had resulted in a mistrial.

■ Counsel complained of the action of the trial court in overruling their motion, made *in limine*, to prevent the United States from using the stipulation which had previously been entered into by the parties. No authority is cited for the proposition that such a stipulation may not be used in a subsequent trial. We find none. We consider the stipulated facts, then, simply in the same light as the other evidence dealing with the existence of the counterfeit bond scheme.

■■ Rule 403 provides:

EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, of needless presentation of cumulative evidence.

This section deals with relevant evidence. Thus, if we consider that the evidence dealing with the continuing bond deal was relevant to the indictment on which these defendants were being tried, it is not necessary to look to Rule 404 which provides that "evidence of other crimes, wrongs, or acts . . . may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In view of the charge that these defendants, "unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together with James W. Graves, . . . to willfully fail to appear for the purpose of execution of sentence" and that they would "assist James W. Graves in obtaining a passport so as to facilitate his absence from the western district of Louisiana and the United States," we are satisfied that the testimony of Graves from which the jury could infer that Brower and Marino were being compensated by a continuation of the bond scam for their assistance in facilitating Graves' skipping the country was relevant to the issue then being tried to the jury. We need not denominate this evidence as tending to prove "motive" or "intent" if it tended to prove the existence of the conspiracy. The fact that, as contended by the appellants, the issue of intent had been waived by a pretrial motion, does not prevent the United States from putting on proof of this kind to establish the fact of the conspiracy.

■ We next turn to the argument that even though the evidence was relevant it was so pervasive, so damaging or so overwhelming as to amount to the "unfair prejudice" which the trial court must consider under Rule 403. The simple answer to this argument is that we deal here with a claim of abuse of discretion by the trial court, since the decision as to whether "its probative value is substantially outweighed by the danger of unfair prejudice" is one to be made by that court. While there was extensive testimony about the actions of Marino, much of it was necessary to show his several relationships with Brower. A close reading of the transcript of the trial makes it abundantly clear that the trial court exercised every precaution to prevent testimony about counterfeit bond schemes other than those which are disclosed in the fore-

going testimony. Appellants' reliance on *United States v. Spletzer*, 535 F.2d 950 (5th Cir. 1976) and other cases there cited is misplaced. Those cases dealt with admissions in evidence of testimony concerning extrinsic crimes under Rule 404(b), and in those cases this Court held that the challenged evidence of a former crime was unnecessary to approve intent. Here, we are dealing with merely the amount of evidence that may be admitted in evidence in order to prove the crime for which defendants are being tried. Moreover, the trial court strictly limited by its charge the purpose for which the jury could consider the evidence of the bond scam. While this charge was too restrictive in the view we take of the case, it benefitted the appellants. We conclude that by the standards announced in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978), we cannot find the trial court to have abused its discretion in admitting this evidence.

■■■ Brower complains of error in the trial court's refusal to grant a severance to him when the court determined to admit the evidence concerning Marino's activities in connection with the bond deal. The alleged error is based upon the erroneous contention that the bond transaction was not connected with the alleged offense. As we have indicated, this is not so. We have given careful consideration to this ground of alleged error even though reviewing courts are very slow to second guess the trial court where a refusal to sever is used as a ground of appeal:

> The decision whether to sever defendants for trial is within the trial court's discretion. It should grant a severance if jurors in a joint trial may not be able to determine the culpability of a defendant fairly, impartially and solely on the basis of evidence relevant to the individual defendant. *United States v. Partin*, 552 F.2d 621, 640 (5th Cir. 1977) (other citations omitted).

*United States v. Crawford*, 581 F.2d 489 (5th Cir. 1978). Here, it is apparent that although much of Graves' testimony dealt with conversations with Marino, the actual number of contacts made with Marino through what the jury could have inferred was with Brower's assistance, made this evidence relevant as against Brower. We are satisfied that the failure to grant the severance was not an abuse of discretion by the trial court. *See United States v. Bolts*, 558 F.2d 316 (5th Cir. 1977).

Appellants next argue that the preindictment delay in the government's seeking to bring them to the bar of justice violated their due process rights under the Constitution. This claim is based on a Supreme Court decision, *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). This Court in *United States v. West*, 568 F.2d 365 (5th Cir. 1978), discussed the *Marion* case as interpreted in the later case of *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). There, we said:

> These statements require that a court in evaluating an asserted due process violation based on pre-indictment delay, consider both the reasons for the delay and the prejudice to the accused. But in identifying a violation, prejudice to the accused is the threshold criterion. As this court recently repeated in *United States v. Brand*, 5th Cir. 1977, 556 F.2d 1312, 1316:

> > The Supreme Court has held that *Marion* requires a showing of actual prejudice. *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752; *see United States v. McGough*, 5 Cir. 1975, 510 F.2d 598; *United States v. Beckham*, 5 Cir. 1975, 505 F.2d 1316, *cert. denied*, 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104; *United States v. Zane*, 5 Cir. 1973, 489 F.2d 269, *cert. denied*, 1974, 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310.

> Though not expressly stated in the prior cases, it is readily inferable from the decisions of this court that the defendants generally bear the burden of establishing actual prejudice. *United States v. Bowdach*, 5th Cir. 1977, 561 F.2d 1160 *United States v. Netterville*, 5th Cir. 1977, 553 F.2d 903; *United States v. Rice*,

84

5th Cir. 1977, 550 F.2d 1364; *United States v. Butts*, 5th Cir. 1975, 524 F.2d 975; *United States v. McGough*, 5th Cir. 1975, 510 F.2d 598. *But see United States v. Barket*, 8th Cir. 1975, 530 F.2d 181, *cert. denied*, 1976, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 282.

*Id.* at 367.

Here, there was no hearing on the matter of prejudice or an effort to ascertain the reasons for the delay. We have carefully examined the record, however, and find that even if the showing made in the motion was adequate to require a hearing, the right to such hearing was waived by the appellants prior to the trial, since the trial court openly inquired as to what matters were pending and no effort was made to call its attention to a pending motion for dismissal based on the delay.

We conclude that the trial court did not commit error in not dismissing the indictments on this ground.

The judgments are AFFIRMED.