**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Houshang SHEIKH, Defendant-Appellant.**

**No. 80–1666.**

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 3, 1981.

Rehearing Denied Oct. 6, 1981.

1058

Steven H. Swander, Fort Worth, Tex., for defendant-appellant.

Paul Coggins, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before RUBIN, RANDALL and TATE, Circuit Judges.

TATE, Circuit Judge:

The defendant Sheikh appeals from his conviction, following trial by jury, on charges of (1) conspiracy to import heroin and to possess heroin with intent to distribute, in violation of 21 U.S.C. § 846 and § 963, and (2) possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). We find the evidence insufficient to support the jury verdict of guilty on the conspiracy charge and, therefore, reverse the conviction on that charge. However, we affirm the conviction for possession with intent to distribute, finding no reversible error in the defendant's contentions, inter alia, that severance of the trial with codefendants having antagonistic defenses was improperly denied, and that Fourth Amendment rights were violated by a customs search, 19 U.S.C. § 1582, at an airport port of entry (nearest the final destination of the goods, but not the first port of entry in the United States).

*The Facts*

On January 22, 1980, a crated package was shipped from Shiraz, Iran, by way of Iran Air, destined for delivery to Denton, Texas. The air waybill (or air consignment note) accompanying the crate listed as the shipper a Mr. Ahmad Javadzadeh and as the consignee a Mrs. Nasren Javadzadeh ("Nasren"). The package first arrived in the United States via Air France at the Houston Intercontinental Airport, was then transferred to American Airlines as per the air way bill, and was then transported by bonded carrier (a subsidiary of American Airlines) instead of by air, pursuant to arrangements made by American Airlines, to the Dallas-Fort Worth Airport (DFW) (the airport of final destination, per the waybill), where the package arrived on January 25, 1980. An American Airlines employee sent to the consignee letter notification of the arrival of the package. Meanwhile, the package remained in the American Airlines in-bond room, where international shipments were stored pending United States Customs inspection. (A primary fourth amendment contention made by the defendant is that although Houston—the airport where the shipment first landed—is a port of entry which is the functional equivalent of the border, the DFW airport—the final waybill destination, to which the goods were transhipped by the American airline to which the goods were transferred by Air France for final carriage to point of destination—cannot be considered as such.)

On January 29, 1980, a customs inspector at DFW opened the crate in order to examine the shipped items—a Koran and its display case. On close inspection, he discovered within the sides of the display case several secret compartments containing what was later determined to be 4.4 pounds of heroin. Drug Enforcement Administration (DEA) agents, who were immediately informed of the discovery, determined to prepare the display case for a controlled delivery. The heroin (except for a 14 gram sample that was returned to a hidden compartment of the display case) was removed from the secret compartments and replaced with Nestle's chocolate. The plastic bags containing the substitute were coated with a powder that stains the skin an orange color on contact. DEA agents also installed in the display case a beeper device wired to emit rapid beeping sounds upon the opening of the hidden compartments.

On February 5, 1980, Nasren, the consignee, picked up the crate and drove from DFW to her apartment in Denton, Texas (the address listed on the air waybill). At approximately midnight of February 6, 1980, DEA agents observed the arrival at the apartment of Hamid Javadzadeh Bijari ("Hamid"), Nasren's brother. Approximately five minutes after his arrival, Hamid left the apartment carrying the crate,

and he put it in the trunk of his car. DEA agents then followed him as he drove to a Sambo's Restaurant in Denton, Texas, where he parked next to a Chevrolet Blazer and then entered the restaurant. Inside he met the defendant Sheikh, and the two returned to the restaurant parking lot. There, Hamid transferred the crate from the trunk of his car to the backseat of Sheikh's Blazer. Both then entered their respective vehicles and returned to Nasren's apartment.

At approximately 3:00 a. m. on the morning of February 7, 1980, Sheikh left the apartment and entered the Blazer (with the crate still inside) and headed toward Dallas. DEA agents followed Sheikh to a motel in Greenville, Texas. At no time prior to this stop did DEA agents within the range of the beeper detect a change from the slow beeping sound emitted by the beeper device to that of a rapid beep (which was to be triggered upon the opening of the secret compartments in the display case). Within minutes of his arrival at the motel room, Sheikh removed the display case (the shipping crate had been discarded in a dumpster at a stop en route) from the Blazer and took it inside his motel room. About two minutes later Sheikh returned to the Blazer, this time to remove a tool box. Soon after Sheikh re-entered the motel room, DEA agents detected a change in the slow beeper signal to that of a rapid beeping sound, an indication that the hidden compartments of the display case had been opened. Immediately thereafter, Sheikh exited the motel room and headed toward the Blazer. However, DEA agents effected his arrest at the door of the Blazer before he could enter. Agents observed at the time of his arrest that Sheikh's hands were stained the same orange color as the powder used to dust the plastic bags inside the secret compartments of the display case. Hamid and Nasren were arrested later the same day at Nasren's apartment.

On February 21, 1980, a federal grand jury returned a two-count indictment charging that (1) on or about January 19 and February 7, 1980, Sheikh, Nasren, and Hamid conspired with each other and with others unknown to import heroin into the United States and to possess heroin with the intent to distribute (violations of 21 U.S.C. § 952(a) and § 841(a)(1)) in violation of 21 U.S.C. § 846 and § 963,[1] and (2) on or about February 7, 1980, Sheikh knowingly and intentionally possessed with intent to distribute approximately 4.4 pounds of heroin, in violation of 21 U.S.C. § 841(a)(1).

All three co-indictees were tried together at a jury trial. The jury returned a verdict of guilty as to Sheikh on both counts and found Nasren and Hamid not guilty on the conspiracy charge, the only count upon which these codefendants were charged. Sheikh was sentenced to ten years on both counts, with the terms to run consecutively. He was also assessed a special parole term of five years on both counts. Sheikh now appeals to this court for review of his convictions.

*The Issues*

The defendant Sheikh urges reversal of his convictions on the following contentions: (1) the trial court erroneously denied his motions for judgment of acquittal urged on the basis of the insufficiency of the evidence to support the jury verdict of guilty on the conspiracy charge; (2) the trial court erroneously denied his motions for sever-

---

1. The pertinent statutory language is as follows:

 Section 952(a):
 (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter . . .

 Section 841(a)(1):
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.
 Sections 846 and 963 make unlawful any conspiracies to commit the offenses described in sections 952(a) and 841(a)(1).

ance made both pre-trial and during the trial of the three defendants; (3) there was a significant variance between the amount of heroin Sheikh was charged with possessing as set forth in the indictment and the amount proven at trial to have been in his possession; (4) the trial court erred in admitting evidence obtained in violation of the defendant's Fourth Amendment rights; and (5) the trial court violated his Sixth Amendment right to confrontation by its failure to conduct an inquiry to determine whether the codefendant Hamid justifiably asserted his Fifth Amendment privilege against self-incrimination.

### 1. The Conspiracy Charge

Sheikh and his codefendants Nasren and Hamid were charged in Count One of the indictment with conspiring with each other and with others unknown to import heroin and to possess heroin with intent to distribute.[2] Sheikh was found guilty of the charged conspiracy despite the acquittal of Nasren and Hamid. Sheikh argues that the district court erred in denying his motions for judgment of acquittal in light of his codefendants' acquittal and the insufficiency of the evidence to prove that he conspired with "others unknown." We agree that a judgment of acquittal on the conspiracy conviction should have been granted based on the insufficiency of evidence to support the jury verdict and, therefore, reverse the judgment of conviction on Count One.

The general rule of this circuit is that the conviction of only one defendant in a conspiracy prosecution will not be upheld when all the other alleged coconspirators on trial are acquitted. *United States v. Klein,* 560 F.2d 1236, 1242 (5th Cir. 1977), *cert. denied* 434 U.S. 1073, 98 S.Ct. 1259, 55

L.Ed.2d 777 (1978); *United States v. Peterson,* 488 F.2d 645, 651 (5th Cir. 1974); *United States v. Musgrave,* 483 F.2d 327, 333 (5th Cir. 1973), *cert. denied* 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). However, a defendant may be convicted of conspiring with persons whose names are unknown or who have not been tried and acquitted, if the indictment asserts that such other persons exist, and the evidence supports their existence and the existence of a conspiracy. *United States v. Klein, supra,* 560 F.2d at 1242; *United States v. Pruett,* 551 F.2d 1365, 1369 (5th Cir. 1977); *United States v. Lance,* 536 F.2d 1065, 1068 (5th Cir. 1976); *United States v. Pena,* 527 F.2d 1356, 1365 (5th Cir. 1976), *cert. denied* 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *United States v. Goodwin,* 492 F.2d 1141, 1144-45 (5th Cir. 1974). In the instant case, with the acquittal of Sheikh's two codefendants, the conspiracy conviction can only be upheld if there is sufficient evidence of the existence of an unnamed, unindicted coconspirator; the indictment (see note 2) having charged the three named defendants with having conspired with one another and "with others unknown" to import heroin from Iran and to possess it with intent to distribute it.

In reviewing the sufficiency of the evidence to support a jury determination of guilty, we are required to consider all the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Where the trial court has denied the defendant's motion for judgment of acquittal, the evidence must be considered in the most favorable light to the government, in order to determine whether a reasonably minded jury could have concluded that the

---

**2.** Count One provided in full text:

That between on or about January 19, 1980, and February 7, 1980, in Tarrant County, Texas, in the Northern District of Texas, and elsewhere, NASREN JAVADZADEH BIJARI, HAMID JAVADZADEH BIJARI and HOUSHANG SHEIKH, defendants, did knowingly, willfully and unlawfully combine, conspire, confederate and agree together, with each other, and with others unknown to

import into the customs territory of the United States from a place outside thereof, that is Iran, heroin, a Schedule I narcotic drug controlled substance, and to possess with intent to distribute heroin, violations of Title 21, United States Code, Sections 952(a) and 841(a)(1).

In violation of Title 21, United States Code, Sections 846 and 963.

evidence was consistent with guilt and, in circumstantial evidence cases, inconsistent with every reasonable hypothesis of innocence. *United States v. Marable,* 574 F.2d 224, 229 (5th Cir. 1978); *United States v. Caro,* 569 F.2d 411, 416 (5th Cir. 1978); *United States v. Pruett, supra,* 551 F.2d at 1369; *United States v. Barrera,* 547 F.2d 1250, 1255 (5th Cir. 1977). We find that under the evidence a reasonably minded jury must have necessarily entertained a reasonable doubt as to Sheikh's conspiring with "others unknown."

The theory advanced by the government in support of the charged conspiracy with "others unknown" is essentially that Sheikh must have had a coconspirator since the package was shipped from Iran after Sheikh had left the country, and it was addressed to the same misspelled "Oake" Street address in Denton, Texas, as found under Nasren's name in Sheikh's address book. The following evidence appears in the record relevant to the proof of the existence of a coconspirator in Iran and of a conspiracy: (1) Sheikh knew a Nassir Alloi, who lived near Shiraz, Iran (the city listed on the air waybill as the shipper's address and from which the package was sent) and whose telephone number was 21507 (the number given on the air waybill as the shipper's); (2) while in Iran from late December of 1979 until January 17, 1980, Sheikh visited with Alloi; (3) Sheikh called Alloi from the United States on January 29, 1980 (the date that Sheikh became aware that the package addressed to Nasren had arrived at DFW); (4) in September of 1979, Alloi sent to Hamid as gifts three ornamental picture frames, one of which Sheikh expressed a particular interest in and took as his own; (5) in December of 1979, prior to his leaving for Iran, Sheikh made several calls to a number in Iran listed in Sheikh's address book (directly under the listing for Nassir Alloi) as that of a Nassir Shirazy, who Sheikh claims is not the same person as Nassir Alloi.

The evidence proves at most that Sheikh had in Iran possibly two associates with whom he communicated prior to his trip to Iran, while in Iran, and after learning of the arrival of the package at DFW. Mere association between persons, however, cannot suffice as proof of a conspiracy. *United States v. Fitzharris,* 633 F.2d 416, 423 (5th Cir. 1980); *United States v. White,* 569 F.2d 263, 268 (5th Cir. 1978). Nor can suspicion, however strong, serve as proof of a conspiracy. *Causey v. United States,* 352 F.2d 203, 207 (5th Cir. 1965). While the government need not prove the existence of a formal agreement or otherwise rely on direct evidence to establish a conspiracy, see *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974), it must do more than pile "inference upon inference" upon which to base a conspiracy charge. *Causey v. United States, supra,* 352 F.2d at 207. Rather, the government must prove beyond a reasonable doubt that the defendant and Alloi, or others unknown, knowingly entered into a conspiracy by which they agreed to import heroin into the United States and to possess it with intent to distribute. See *United States v. Gutierrez,* 559 F.2d 1278, 1280 (5th Cir. 1977); *United States v. Barrera, supra,* 547 F.2d at 1255.

Thus, while it is reasonable to speculate, as the government suggests, that Sheikh travelled to Iran to meet Alloi and arrange shipment of the heroin to the United States for distribution, and later called him to confirm that the heroin had been received as per their agreement, such speculation does not constitute proof beyond a reasonable doubt that the person in Iran *knowingly* agreed or conspired with Sheikh to perform acts with the intent to import heroin into the United States. See *United States v. White, supra,* 569 F.2d at 268. It is just as reasonable to infer from the evidence that while Sheikh was in Iran he made arrangements to have a person in that country mail to Nasren what the shipper believed to be only a Koran in a display case.

In the absence of evidence inconsistent with the latter hypothesis, or of any evidence from which the jury might infer a *knowing* agreement by the transhipper to participate in the importation of heroin into

the United States, we must reverse the conspiracy conviction on the basis of insufficiency of the evidence. See, e. g., *United States v. Fitzharris, supra,* 633 F.2d at 422–23; *United States v. Caro, supra,* 569 F.2d at 416–19; *United States v. White, supra,* 569 F.2d at 267–68; *United States v. Pruett, supra,* 551 F.2d at 1368–69; *United States v. Barrera, supra,* 547 F.2d at 1256–57; *United States v. Pena, supra,* 527 F.2d at 1364–65.

### 2. *The Severance Issue*

At the trial below, Sheikh repeatedly urged—and was each time denied—his motion for severance first presented pretrial. The trial court's denial of the motion, Sheikh insists, deprived him of his right to a fair trial. Specifically, Sheikh complains that he was subjected to trial alongside codefendants who asserted antagonistic defenses and who, in effect, aided the government in the prosecution of its case against Sheikh. While the issue raised presents an extremely close question of error, we cannot say—under the specific circumstances before us, and especially in light of the trial court's actions taken to avoid possible prejudice to Sheikh—that he was denied a fair trial by the district court's denial of severance.

▆▆▆ The decision to grant or to deny a motion for severance rests within the sound discretion of the trial court,[3] which will not be overturned on appeal without an affirmative showing of an abuse of discretion.[4] Rule 14 of the Federal Rules of Criminal Procedure,[5] providing for relief from joinder of defendants, has been interpreted to require that prejudice to the defendant attendant to a joint trial be balanced against the interests of judicial economy to determine whether severance ought to be granted. *United States v. Garza,* 563 F.2d 1164, 1166 (5th Cir. 1977), *cert. denied* 434 U.S. 1077, 98 S.Ct. 1268, 55 L.Ed.2d 783 (1978). The degree to which prejudice may be lessened by other remedial court action should also be considered. *Id.* Thus, the complaining party should be granted relief on appeal only upon a showing of compelling prejudice, which the trial court could not alleviate in the absence of severance and which effectively denied the party a fair trial. *United States v. Horton,* 646 F.2d 181, 186 (5th Cir. 1981); *United States v. Mota,* 598 F.2d 995, 1000 (5th Cir. 1979), *quoting United States v. Swanson,* 572 F.2d 523, 528 (5th Cir. 1978), *cert denied* 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978).

Sheikh attempts to establish compelling prejudice in two respects. First, he claims that his defense at trial was antagonistic to the defenses asserted by his codefendants. Both Sheikh and the codefendant Hamid testified that they drove together in Sheikh's Blazer from Panama City, Florida (where both lived) to Denton, Texas. Both testified that they rented a car at DFW which Hamid used to drive to Nasren's to pick up the package while Sheikh remained at the Sambo's Restaurant in Denton. Neither admitted, however, to having any knowledge of the existence of the hidden heroin or to having any reason to believe the other may have known of the heroin.

---

**3.** *United States v. Horton,* 646 F.2d 181, 186 (5th Cir. 1981); *United States v. Aguiar,* 610 F.2d 1296, 1302 (5th Cir. 1980); *United States v. Swanson,* 572 F.2d 523, 528 (5th Cir. 1978), *cert. denied* 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978).

**4.** *United States v. Aguiar,* 610 F.2d 1296, 1302 (5th Cir. 1980); *United States v. Mota,* 598 F.2d 995, 1000 (5th Cir. 1979), *quoting United States v. Swanson,* 572 F.2d 523, 528 (5th Cir. 1978), *cert. denied* 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978); *United States v. McLaurin,* 557 F.2d 1064, 1075 (5th Cir. 1977), *cert. denied* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978).

**5.** Rule 14. Relief From Prejudicial Joinder.

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

Despite the above consistencies, Sheikh contends that the thrust of the defenses was so antagonistic as to deny Sheikh a fair trial in the absence of severance. In essence, Sheikh represented at trial that (1) he agreed to take Hamid to Denton because he, Sheikh, wanted to try out his new Blazer and possibly visit friends in Houston, Texas; (2) it was Hamid's idea to rent a car (used later to pick up the crated package from Nasren's apartment) at DFW before going on to nearby Denton; (3) upon their arrival in Denton, it was Hamid who suggested that Sheikh wait at the Sambo's Restaurant in Denton (where the package was transferred from the rented car to Sheikh's Blazer) until Hamid returned from Nasren's apartment (where Hamid picked up the package); and (4) the package belonged to Hamid, who asked Sheikh to take it back to Panama City. Furthermore, Sheikh testified that the envelope of lidocaine (used to cut down cocaine and heroin) found in Sheikh's wallet at the time of his arrest was given to him by Hamid.

Hamid, on the other hand, testified that (1) he intended to visit Nasren long before he became aware of the existence of the package; (2) Sheikh admitted to having sent the package from Iran to Nasren's address; (3) Sheikh said he sent packages from Iran to different addresses in the United States in order to insure that they were gotten out of the country successfully; and (4) it was Sheikh's idea to rent the car for Hamid and then have Hamid pick up the package and meet Sheikh at the Sambo's Restaurant. Hamid also denied having given Sheikh the envelope of lidocaine. The codefendant Nasren, consistent with her brother's testimony, defended that it was her understanding that the package sent to her belonged to Sheikh.

▮ The existence of antagonistic defenses among codefendants is cause for severance when the defenses conflict to the point of being irreconcilable and mutually exclusive. *United States v. Horton, supra,* 646 F.2d at 186; *United States v. Marable, supra,* 574 F.2d at 231. On appeal, however, the trial judge's denial of severance may be reversed only on a showing that the defendant suffered "compelling prejudice." *United States v. Horton, supra,* 646 F.2d at 186. In the instant case, the crux of the defense of each defendant was that he or she was ignorant of the existence of the heroin in the hidden compartments of the display case. To some extent, then, the defenses were not antagonistic. However, additionally each defendant contended that the crate containing the display case belonged to the other. Undoubtedly, in this respect, the defenses are so antagonistic as to be irreconcilable and mutually exclusive. Nevertheless, we do not find this antagonism sufficient under the particular facts to establish that Sheikh suffered the compelling prejudice that requires reversal of his possessory conviction because of the denial of severance.[6] In so concluding, we emphasize that the essence of the defense of each codefendant—the absence of guilty knowledge—was not antagonistic with that of the other, and that no defendant indicated that he or she knew or believed the other to have had knowledge of the existence of the heroin. To the contrary, Hamid testified that he had no reason to doubt the veracity of Sheikh's explanation that it was necessary to send articles from Iran to various addresses in the United States in order to get them safely out of the former country. In addition, the evidence concerning Sheikh's involvement with the shipments, summarized in our discussion of the sufficiency of the evidence to support the conspiracy conviction, together with the evidence concerning Sheikh's actions in driving alone to Greenville with the package and, thereafter, in opening it, point so strongly to Sheikh's possession that there was little, if any, actual prejudice to him in the joinder of his codefendants. The prejudice was to the codefendants, but they did not seek severance and were, indeed, acquitted.

---

**6.** Because of our earlier reversal of the conspiracy conviction on other grounds, our present review of the merits of Sheikh's severance claim is limited to a determination of whether he suffered compelling prejudice with regard to the possessory conviction.

The defendant Sheikh also attempts to establish compelling prejudice resulting from the denial of severance on the basis that his codefendants exhibited at trial an antagonistic attitude toward him. In effect, he claims that he was prosecuted not only by government counsel but also by counsel for Hamid and counsel for Nasren.

 The taking of an adversarial stance on the part of counsel for codefendants may generate trial conditions so prejudicial to the codefendant under multiple attack as to deny him a fair trial. See *United States v. Johnson*, 478 F.2d 1129 (5th Cir. 1973); *United States v. Valdes*, 262 F.Supp. 474 (D.P.R. 1967). Considering the length of the trial (it lasted approximately three weeks) and the trial judge's constant efforts to insure that the attorneys for Nasren and Hamid did not themselves act as prosecutors, we do not find that isolated instances of concerted attack as found in the trial court record created the sort of compelling prejudice necessary to warrant a severance.[7]

 In sum, after a careful review of the record, we are not left with a definite and firm conviction that the defendant Sheikh may have been prejudiced by the trial court's refusal to grant the motion for severance made only by Sheikh. See 1 Wright, Federal Practice and Procedure: Criminal § 227 (1969). We reach this conclusion keeping in mind the view that in conspiracy cases persons jointly indicted should ordinarily be tried together. See *United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973), cert. denied 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); 1 Wright, *supra*, § 223, *but see id.*, § 226. In the face of possibly antagonistic defenses and hostility among codefendants, the trial judge properly and successfully lessened the degree of possible prejudice to Sheikh through careful trial supervision. Under these circumstances, Sheikh was not denied a fair trial.

3. *The Variance Between the Indictment and the Evidence Presented at Trial*

 Sheikh asserts that the trial court erroneously denied his motion for judgment of acquittal on the possession with intent to distribute conviction, charged by Count Two, because of the significant variance between the allegations of that count of the indictment and the proof at trial. Count Two charged Sheikh with possessing, on or about February 7, 1980 (the date of his arrest), with intent to distribute, *4.4 pounds of heroin*. At trial, the government proved that Sheikh was found in possession at the time of his arrest of *14 grams* (i. e., about one-half ounce, but see note 9) of heroin (i. e., the amount retained in the display case hidden compartments from the original 4.4 pounds of heroin discovered pursuant to the earlier customs search). Although a variance may have existed, we reject the defendant's contention that the variance is material or warrants a judgment of acquittal on the charge of possession of *4.4 pounds of heroin* with intent to distribute.

 Not every variance between the indictment and the proof is fatal to a conviction. In order for a variance to be fatal, thus mandating reversal, it must affect the substantial rights of the accused either (1) by insufficiently informing him of the charges against him such that he is taken by surprise and prevented from presenting a proper defense, or (2) by affording him insufficient protection against reprosecution for the same offense. *United States v. Juarez*, 573 F.2d 267, 278–79 (5th Cir. 1978), cert. denied 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978). *See also Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *United States v.*

---

7. Generally, the two attorneys representing Hamid and Nasren tended to "aid in the prosecution" of the government's case on their cross-examination of government witnesses. However, the testimony generally elicited by their questioning served to reiterate what had been brought out on direct that was favorable to their own clients' cases and unfavorable to Sheikh's. On at least two such occasions, the trial judge intervened to prevent any possible prejudice to Sheikh, first by refusing to allow counsel to introduce certain evidence of questionable relevance (and in all likelihood prejudicial to Sheikh), and second by cautioning counsel to refrain from aiding in the prosecution of Sheikh.

*Lambert,* 501 F.2d 943, 947–48 (5th Cir. 1974) (en banc). The defendant has failed to prove how the variance in proof of the amount of heroin actually possessed on the date of his arrest affected his substantial rights. There was no variance in proof as to the date of possession and substance possessed. Thus, in the absence of a showing to the contrary, we find the defendant was sufficiently notified of the crime charged to enable him to present a proper defense. Nor is there convincing argument made that the defendant could not successfully plead former jeopardy against reprosecution.[8] We thus hold that the variance between the amount of heroin set forth in the indictment and the amount proved is not fatal and cannot form the basis for reversal of the conviction on Count Two.

Based upon the government's failure of proof that Sheikh possessed the 4.4 pounds of heroin as charged in the indictment, Sheikh raises a subsidiary evidentiary issue. In particular, he urges as reversible error the trial court's admission into evidence of testimony of (1) the street level dosage (generally found to be one to two percent pure heroin) equivalent in grams and pounds (96,214 grams or 212 pounds) of the 4.4 pounds of heroin (between 73%–76% pure) found in the display case during the customs search, and (2) the street value (ranging from $50–$100) of a gram of heroin at the street level dosage.

Evidence of the price or the quality of a narcotic possessed is generally relevant to prove intent to distribute. *United States v. Palmere,* 578 F.2d 105, 108 (5th Cir. 1978), *cert. denied,* 99 S.Ct. 1026, 439 U.S. 1118, 59 L.Ed.2d 77 (1979).

Thus, the street level dosage equivalent of the 4.4 pounds of heroin proved to have been imported into the United States from Iran was relevant to prove intent to distribute under the conspiracy count (Count One). Moreover, the testimony concerning the level of pure heroin generally found in a street level dosage was relevant to prove intent to distribute on the basis of possession of the 14 grams of heroin found to be 76% pure.[9] The trial court's admission of the testimony presents no reversible error.

### 4. *The Alleged Fourth Amendment Violations*

At trial, the defendant Sheikh objected to the introduction of evidence obtained as the result of (a) the warrantless customs inspection of the package at DFW, (b) the warrantless attachment and use of an electronic beeper inside the package, and (c) the warrantless search of the defendant's motel room at the time of his arrest. On appeal, the defendant raises as reversible error the trial court's admission of this evidence, alleged to have been obtained in violation of the defendant's fourth amendment rights. We find no reversible error.

### (a) *The Customs Inspection at DFW*

The substance of the defendant's complaint as to the warrantless search at the

---

**8.** The defendant, in fact, does not actually argue that he is prejudiced by the variance because he will not be able to defend successfully against reprosecution. Rather, he urges prejudice on the basis that the government irrationally tried him for actual possession instead of attempted possession of the 4.4 pounds of heroin. The charge of possession with intent to distribute includes the lesser offense of attempted possession with intent to distribute (21 U.S.C. § 846). See Rule 31(c), Fed.R.Crim. Proc. In effect, then, he was tried for attempted possession as well. Since the charge of possession of 4.4 pounds includes attempted possession of 4.4 pounds, the defendant is protected against reprosecution at some later date on the latter charge.

**9.** Computed on the basis of a street level of purity at a little over 2%, the 14 grams (of 75–76% purity) Sheikh was found to have possessed at the time of his arrest equals approximately 500 grams of street level dosage heroin. These 500 grams would have a street value of between $25,000 and $50,000. See *United States v. Mather,* 465 F.2d 1035 (5th Cir. 1972), *cert. denied* 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972). The jury might also infer a possession with intent to distribute from the circumstantial evidence that Sheikh thought he possessed the larger quantity of heroin, as would have been the case if the DEA had not substituted a like quantity of Nestle's chocolate. See *United States v. Ramirez,* 608 F.2d 1261, 1264 (9th Cir. 1979); *United States v. Washington,* 586 F.2d 1147, 1153 (7th Cir. 1978).

DFW airport is: Since the air shipment had first entered the United States at the Houston airport port of entry before its transfer to the DFW airport port of entry, a customs search under 19 U.S.C. § 1582 (see note 10) (authorizing routine customs searches upon entry into the United States) was not authorized. Since therefore the search was not made at the functional equivalent of an international border but rather at an inland city to which the package had been shipped following entry into the United States, reasonable suspicion was required to justify the warrantless search. 19 U.S.C. § 482 (see note 14).

On January 29, 1980, customs inspector Cromer opened the crated package (containing the Koran, the display case, and the heroin) while it was stored in the American Airlines in-bound room, an area set aside by the carrier to house international freight that has not yet cleared customs. By way of this warrantless customs inspection, pursuant to which the 4.4 pounds of heroin was discovered, the DEA investigation was set in motion which ultimately led to the defendant's arrest. Sheikh attempted by a motion to suppress to prevent the government's introduction of the heroin thus obtained. The trial court denied the defendant's motion on the basis that the warrantless inspection was authorized by 19 U.S.C. § 1582, 19 C.F.R. § 162,[10] providing for warrantless customs searches of persons, baggage, and merchandise coming into the United States. We agree.[11]

■ Warrantless searches made at the international borders of the United States are considered reasonable under the Fourth Amendment simply by virtue of the fact that they occur at the border. *United States v. Ramsey*, 431 U.S. 606, 616–20, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977). Moreover, routine border searches may be conducted regardless of whether customs officials have a reasonable or articulable suspicion that criminal activity is afoot. *United States v. Chaplinski*, 579 F.2d 373, 374 (5th Cir. 1978), *cert. denied*, 439 U.S. 1050, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *United States v. Himmelwright*, 551 F.2d 991, 993–994 (5th Cir. 1977), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). See also *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). We have held that 19 U.S.C. § 1582 provides statutory authorization for warrantless border searches by customs officials of all persons, baggage, and merchandise entering the United States. *United States v. Pringle*, 576 F.2d 1114, 1116 (5th Cir. 1978). The warrantless border searches do not require either probable cause or individualized suspicion of criminal activity. *Id.* See also *United States v. Scheer*, 600 F.2d 5, 7 (3d Cir. 1979); *United*

---

**10.** 19 U.S.C. § 1582 provides:

The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations. An implementing regulation, 19 C.F.R. § 162.-6, provides:

All persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a Customs officer. District directors and special agents in charge are authorized to cause inspection, examination, and search to be made under section 467, Tariff Act of 1930, as amended (19 U.S.C. 1467), of persons, baggage, or merchandise, even though such persons, baggage, or merchandise were inspected, exam-

ined, searched, or taken on board the vessel at another port or place in the United States or the Virgin Islands, if such action is deemed necessary or appropriate.

**11.** The trial court concluded that Sheikh had standing to raise the issue of the validity of the customs search. The government contests this conclusion on appeal—despite urging as well its theory of the case that the package belonged to Sheikh even before he came into the actual possession of it. "[A] prosecutor may, with legal consistency and legitimacy, assert that a defendant charged with possession of a seized item did not have a privacy interest violated in the course of the search and seizure." *United States v. Salvucci,*, 448 U.S. 83, 88–89, 100 S.Ct. 2547, 2551, 65 L.Ed.2d 619 (1980). We will, however, pretermit discussion of the issue since we find that the search is not constitutionally infirm.

*States v. Odland*, 502 F.2d 148, 151 (7th Cir. 1974).[12]

The applicability of § 1582 in the case before us thus depends upon whether, for purposes of the warrantless search by the customs officer of the package originating outside the United States, DFW can be considered an international border or its functional equivalent.

■ The functional equivalent of an international border includes, by way of example, the United States airport that serves as the destination for a nonstop flight from a foreign point. *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *United States v. Himmelwright, supra*, 551 F.2d at 993–94. Such an airport is considered the functional equivalent of a border because of (1) the existence of reliable indications that the thing to be searched is of international origin and has not been changed in any way since entering the United States; and (2) the degree of regularity with which searches at the point in question are conducted such that the intrusion is minimal, the existence and function of the checkpoint are known in advance, and there is little discretionary enforcement activity. *United States v. Brennan*, 538 F.2d 711, 715–16 (5th Cir. 1976). For these same reasons, we consider DFW, under the circumstances here presented, the functional equivalent of a border.

[20] In the instant case, the air waybill accompanying the package indicated that it was sent from Iran by way of Iran Air. The waybill issued by Iran Air stated the airport of final destination was Dallas DFW, also indicating intermediate transfers at Paris (where it was to be transferred to Air France), and Houston (where Air France was to transfer it to American Airlines for final transit to Dallas DFW airport). The package first arrived in the United States on January 24, 1980, via Air France at the Houston Intercontinental Airport. It was immediately transferred from that Houston freight terminal to the American Airlines freight terminal. American Airlines then shipped the package by truck to its freight terminal at DFW. *At all times after the package entered the United States until it was searched at DFW by customs inspector Cromer it remained under a United States customs bond.* Prior to the January 29, 1980 search at DFW, the package had not cleared customs, and the evidence negatives any indication it had been tampered with. Thus, the evidence shows reliable procedures to insure that the package came from a foreign point and remained in the same condition until an actual customs inspection could be made. (In this case, the customs inspection developed into a customs search.) Additionally, since DFW is itself an international port of entry, foreign shippers are put on notice that a package passing through that airport will be subject to a routine customs search, if it has not previously been subject to customs inspection. A customs official testified that under customs procedures the port of entry of a consignment is normally considered the international port of entry closest to the consignee's address; the consignee or a representative must (at the port of entry) clear the shipment through customs as dutiable or nondutiable.

Under these circumstances, for purposes of the customs search, the DFW international port of entry at Dallas was the functional equivalent of a border. The package was shipped from abroad with that port of entry as its final destination, and it was at all times in international transit or under customs bond until it arrived there, the international port of entry closest to the consignee's address and the place where normally routine customs inspection was made before delivery to the consignee. The package arrived at the Houston port of entry by nonstop flight from abroad; it is not disputed that, for purposes of a customs inspection and search, the Houston port could be considered the functional equiva-

---

12. In *Pringle, supra*, a panel of this circuit specifically upheld the constitutionality of § 1582 as interpreted. 576 F.2d at 1117.

lent of the border. For similar functional reasons, the Dallas DFW international port of entry should equally well be considered the functional equivalent of a border; it was the intended final-destination international port of entry, the package had been transported under customs bond (and thus under official custody of the customs service) from Houston to Dallas DFW, and the DFW port of entry was the place at which the routine customs inspection would normally be made before customs clearance and delivery of the foreign package to the consignee. For all practical purposes, the package reached the end of a "nonstop" flight when it arrived at DFW. See *United States v. King*, 517 F.2d 350, 354, n.2 (5th Cir. 1975), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2943, 64 L.Ed.2d 825 (1980). See also *United States v. Gallagher*, 557 F.2d 1041, 1044 (4th Cir. 1977), *cert. denied* 434 U.S. 870, 98 S.Ct. 213, 54 L.Ed.2d 148 (1977).[13] Thus, the warrantless customs inspection—made at the functional equivalent of an international border—was a valid border search within the terms of § 1582 and its implementing regulation, and therefore, did not violate the Fourth Amendment.

The defendant nevertheless argues that § 1582 was not intended to encompass searches carried out at inland cities, especially when the package first enters the United States at a point other than that at which the search occurs.[14] He relies on several circuit decisions which he interprets as implying that § 1582 does not apply to non-border or equivalent entry point searches.[15] These cases may indeed indicate that § 1582 is limited in application to border (or functional equivalent) searches; but they do not imply that under no circumstances may a point other than the initial point of entry be considered the functional equivalent of the border.[16]

(b) *The Warrantless Attachment and Use of the Beeper*

Following the above-described customs inspection and the resulting discovery of

---

**13.** The court in *Gallagher* applied a similar rationale to determine that the designated city of destination for the shipment was the border under the circumstance that the shipment was transported under bond from a point outside the United States to the city of destination via another American city. The court thus concluded that the search of the shipment at the city of destination (and while it was still in official custody of United States Customs) was a border search for purposes of 19 U.S.C. § 482. Section 482 requires that the government official have reasonable suspicion to search the incoming item. While no mention is made in the opinion of § 1582, which we apply in the instant case, we find no indications contrary to the application of the same rationale to determine what is a border or its functional equivalent for purposes of § 1582.

**14.** The defendant contends that if a warrantless customs search is at all authorized at a point other than the original port of entry it must be made pursuant to 19 U.S.C. § 482. This section provides in pertinent part:

"Any of the officers or persons authorized to board or search vessels may ... search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law...."

Based on our disposition of the search under § 1582, we need not decide whether there existed reasonable cause to suspect the presence of heroin in the package.

**15.** See *United States v. Scheer, supra*, 600 F.2d at 7 and n.6 (section 1582 applies to search at border or equivalent entry point; section 482 applies to search somewhere other than at border); *United States v. Lowe*, 575 F.2d 1193, 1194 (6th Cir. 1978) (section 482 applies to customs inspection of foreign packages during course of delivery at inland city not the original port of entry); *United States v. Odland, supra*, 502 F.2d at 151 (section 1582 applies to spot-check of incoming international mail at the port of entry).

**16.** The defendant fails to distinguish between the "functional equivalent of the border" concept and the doctrine of "extended border searches." The latter is invoked to uphold warrantless searches of persons and things once they have entered the country. *United States v. Richards*, 638 F.2d 765, 771 (5th Cir. 1981). Stricter standards are applied to this sort of search, including the requirement that the government agents possess a reasonable suspicion, supported by articulable facts, that the person or thing searched is involved in illegal activity. *Id.* at 771–72. Since we have found at the outset that DFW was the functional equivalent of a border, we need not rely on the "extended border search" doctrine or § 482 in order to uphold the warrantless search of the package.

the heroin, DEA agents inserted (without prior warrant authorization) an electronic beeper device in the package. They did so for the purpose of effectuating a controlled delivery of the package containing the contraband drugs. The beeper was designed to emit a slow constant beeping sound that would become a steady, more rapid beeping sound upon the opening of the secret compartments. The latter sound was first detected by DEA agents while the package was situated in Sheikh's motel room immediately prior to his arrest. Sheikh's motion to suppress any evidence obtained by the government as a result of the use of the electronic beeper was denied by the trial court. We agree with this ruling.

In analyzing the constitutionality of their actions, we deal separately with three phases of government action: the attachment of the beeper, its subsequent monitoring, and its eventual use not merely to follow the contraband but to detect Sheikh's activities occurring in a place hidden from public view. *See* 1 W. LaFave, Search and Seizure § 2.7(d), (1978).

 The beeper was lawfully attached at the time of the border search. There was neither need for a warrant to permit the border search nor a reasonable expectation of privacy. *United States v. Lewis*, 621 F.2d 1382 (5th Cir. 1980), *cert. denied*, 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 730 (1981). Given the lawfulness of the attachment of the beeper, the use of its signal to follow the contraband on public highways is not a Fourth Amendment violation. *United States v. Michael*, 645 F.2d 252 (5th Cir. 1981) (en banc). *Cf. United States v. Conroy*, 589 F.2d 1258, 1263–64 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979) (transmission of beeper signal from a vessel to aid tracking not an invasion of privacy when informant on the vessel attached the beeper and had no legal obligation to conceal his whereabouts).

 The beeper used here, however, had a dual function. Not only was the beeper used to track the contraband, but it was also used to signal an activity occurring in a private place. The only activity communicated was the opening of a hidden compartment containing contraband. There was no transmission of conversation, no hidden camera, nor any effort to detect any personal events. Considering the extremely limited type of monitoring, the fact that the monitoring was limited to determining when a compartment containing *known* contraband and nothing else was opened, and the lawfulness of the beeper's attachment, we hold that this use of the beeper did not transgress the Fourth Amendment.

#### (c) *The Warrantless Motel Room Search*

The final allegation of trial court error with respect to Fourth Amendment violations is based upon the warrantless search of Sheikh's motel room immediately *subsequent* to his arrest outside the motel room. In essence, Sheikh contends that the search does not fall within the exception to the Fourth Amendment warrant requirement established for limited searches incident to a valid arrest. Nevertheless, the warrantless searches of the motel room and of the defendant immediately subsequent to his arrest did not violate the Fourth Amendment, for both searches fell within carefully delineated exceptions to the warrant requirement.

 Arresting officers have a right to conduct a quick and cursory check of the arrestee's lodging immediately subsequent to arrest—even if the arrest is made near the door but outside the lodging—where they have reasonable grounds to believe that there are other persons present inside who might present a security risk. *See United States v. Diecidue*, 603 F.2d 535, 558–59 (5th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980) (security search of house); *United States v. Bowdach*, 561 F.2d 1160, 1168–69 (5th Cir. 1977) (security search of apartment). Here, the evidence shows that the officers did not know whether Sheikh was going to meet someone inside the motel room. Once legally inside the premises for purposes of the security check, the officer may seize any-

thing found in plain view that is obviously evidence. *United States v. Diecidue, supra,* 603 F.2d at 559; *United States v. Bowdach, supra,* 561 F.2d at 1169. *See also Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

▮ In the instant case, Sheikh was arrested outside his motel room, within 12–15 feet of the door, just after he had left it, door ajar. The DEA agents' warrantless lookover (security check) of the motel room immediately following Sheikh's arrest was justified by their reasonable suspicion that one or more persons might have remained inside the motel room. The subsequent seizure of the Koran, the display case and its contents (all in plain view on a table in the motel room), and Sheikh's passport (in plain view on the motel room bed) is supported by the plain view doctrine.[17]

▮ A full search of the person incident to a lawful custodial arrest is excepted from the warrant requirement of the Fourth Amendment. *United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). Thus, the search of the defendant's person subsequent to his arrest, resulting in the discovery of his wallet in his trousers pocket (as shown by the evidence considered in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942),[18]) is also justified without prior search warrant authorization.

### 5. The Sixth Amendment Claim

The defendant contends that he was denied the right to compulsory process guaranteed by the Sixth Amendment because the trial court permitted the codefendant Hamid to assert his Fifth Amendment privilege against testifying but failed to inquire into the basis for the assertion.

On Sheikh's case in chief, defense counsel, out of the presence of the jury, requested that the codefendant Hamid be called to the stand. Hamid invoked his privilege against self-incrimination, which was immediately sustained by the district court. Counsel for Sheikh then requested that the district court hold a hearing to determine the basis for Hamid's claimed Fifth Amendment privilege. The court refused the request on the basis that Hamid, as a defendant, has an automatic right to refuse to testify.

We find that the district court's recognition of the codefendant's asserted Fifth Amendment privilege without further inquiry was not erroneous.

▮ A determination that a Fifth Amendment privilege has been properly invoked is left to the informed discretion of the trial judge. *United States v. Metz,* 608 F.2d 147, 156 (5th Cir. 1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). Since the assertion of a Fifth Amendment claim, without more, does not exonerate a *witness* from testifying, the trial judge must determine the validity of the claim. *United States v. Van Deveer,* 577 F.2d 1016 (5th Cir. 1978). Thus, the courts have developed a practice whereby, outside the presence of the jury, the trial court judge examines the witness to determine whether reasonable grounds exist to uphold the privilege. *United States v. Goodwin,* 625 F.2d 693, 701–702 (5th Cir. 1980); *United States v. Metz, supra; Unit-*

---

**17.** Even assuming that the security search of the motel room was questionable under the Fourth Amendment, the seizure of the Koran and the display case and its contents, as well as the passport, is justified by the plain view doctrine based on Agent Pfieffer's inadvertent glance into the motel room, through the opened door, onto the table in plain view.

**18.** DEA Agent Gates testified that he discovered the wallet in Sheikh's right hip pants pocket upon searching him following the arrest but once back inside the motel room. Gates also testified that he found the passport in plain view on the bed in the motel room. Contrary to Gates' testimony, Sheikh claimed, while on the witness stand, that the passport and the wallet and its contents were inside his jacket which he had earlier placed inside the motel room on a chair, where it remained until the time of his arrest. Consistent with *Glasser, supra,* our analysis of the Fourth Amendment claim is made according to the facts as testified to by Agent Gates.

ed States v. Melchor Moreno, 536 F.2d 1042, 1046–47 (5th Cir. 1976); *United States v. Gomez-Rojas,* 507 F.2d 1213, 1219–20 (5th Cir. 1975). It is the district court's refusal to make this sort of inquiry that forms the basis for Sheikh's claim of violation of his Sixth Amendment right to compulsory process.

■ We reject the defendant's contention, under the circumstances shown, that a district court's determination of the validity of a Fifth Amendment privilege claimed by a *codefendant* jointly tried must be overturned in the absence of an inquiry into the grounds supporting the claim. At the time Hamid asserted his Fifth Amendment privilege and refused to testify, the government had already presented its case in chief. In the government's case, it attempted to implicate Hamid as well as Sheikh in the conspiracy to import the heroin. Sheikh's attempt to call Hamid to the stand was made with the apparent purpose of exculpating Sheikh at the expense of Hamid. The district court was in a position to assess the situation and determine the validity of Hamid's claim without conducting further inquiry. The district court correctly determined that the codefendant validly asserted the Fifth Amendment privilege in the trial of a charge against him. *See United States v. Marable,* 574 F.2d 224, 231 (5th Cir. 1978).

Moreover, the record shows that Hamid later agreed to testify during Sheikh's defense (although Sheikh rested instead of calling Hamid to the stand), and Sheikh was able to cross-examine Hamid later in the trial.

We find no Sixth Amendment violation.

*Conclusion*

Based on the insufficiency of the record evidence to support a finding that the defendant Sheikh conspired with anyone, as charged in Count One of the indictment, we hold that the judgment of acquittal as to the conspiracy count should have been granted. The judgment on Count One is thus REVERSED. We AFFIRM, however, the judgment of conviction for possession with intent to distribute, finding no merit to the defendant's further allegations of

trial court error. We REMAND the case to the district court with directions that the indictment be dismissed as to the conspiracy count.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.