**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Melvin MARABLE and Douglas E. Jones, Defendants-Appellants.**

**No. 77–5413.**

United States Court of Appeals,
Fifth Circuit.

May 30, 1978.

Rehearing Denied June 29, 1978.

David B. Byrne, Jr., Montgomery, Ala., Herbert Shafer, Atlanta, Ga., for Marable.

Mark J. Kadish, Atlanta, Ga., for Jones.

William L. Harper, U.S. Atty., Robert A. Boas, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before TUTTLE, COLEMAN and CLARK, Circuit Judges.

COLEMAN, Circuit Judge.

## MULTI PARTY–MULTI ATTACK

Melvin Marable, Douglas Jones, Horace Jones, and Clarence Cole, Jr. were jointly indicted in a three-count indictment for drug offenses.

Count 1 charged all four men with *conspiring* to possess with the intent to distribute, and to distribute, heroin.

Count 2 charged Horace Jones with the substantive offense of distributing heroin.

Count 3 charged that Clarence Cole, Jr. and Douglas Jones possessed heroin with the intent to distribute it.

All counts were grounded on 21 U.S.C. § 841(a)(1).

Cole pled guilty. A jury convicted the other three, but only Marable and Douglas Jones appeal. The result is that we now have Marable and Douglas Jones as to the heroin conspiracies and Douglas Jones for possession.

The convictions of both men will be affirmed.

## FACTS

Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the facts are:

In early 1976 Cole approached Marable with the proposition that they, as partners, engage in narcotic drug traffic. In further-

ance of their partnership agreement, Cole and Marable traveled to Atlanta in July to confer with several *cocaine* buyers, including the government informer, Richard Carlee.

On July 11, the government informer, Carlee, notified Detective Johnny Turner, an Atlanta police detective assigned to the Drug Enforcement Administration (DEA) as an undercover agent, that he had arranged for Turner to buy one to two "kilos" (kilograms) of *cocaine* from Cole. Turner was told to be at the Mark Inn in Fulton County, Georgia, around midnight July 12. When Turner arrived, Cole and Marable were sitting in a Lincoln Continental, parked next to a Toyota occupied by Horace Jones. No business was transacted on the first encounter but the participants decided to meet later.

Approximately two and a half hours later, a meeting occurred at the Waffle House Restaurant in Clayton County, Georgia, attended by Carlee, Turner, Sergeant Wood, a DEA agent, Cole, and Marable. Douglas Jones was not there. The purpose of the meeting was to negotiate the purchase of *cocaine*. This resulted in an agreement to meet in Miami, where Turner could buy two kilos of *cocaine*.

The parties, except for Sgt. Wood, resumed negotiations on the *cocaine* transaction at the Marriot Motel in Miami on the next day, July 14. Although the meeting was scheduled for the sale of cocaine, none changed hands.

The idea of a possible heroin buy entered the picture when Turner casually mentioned that he had a customer for "brown stuff" (heroin) but no supplier. *Marable responded that he would check his sources and get back to Turner.*

Several days later, Turner expressed his desire to resume negotiations on the drug deals. On July 19, a meeting between Woods, Turner, Carlee, Dr. Overton (informer), Marable, and Cole was held at a roadside rest stop near LaGrange, Georgia. The discussions initially centered on the cocaine buy. Turner brought up the subject of heroin and asked Marable if Marable

could get him some of the "brown stuff". Marable agreed to check on it and advised Turner that he had a source for the "brown stuff" who would probably deliver in Atlanta but that the price, quality, and quantity remained to be ironed out.

The next day, Marable and Turner talked via a tapped telephone. After proposing a time and place for the *cocaine* buy, Turner questioned Marable about the heroin deal. Marable suggested that the negotiations on the "brown stuff mentioned in Miami" be continued the next day.

The last contact Turner had with Marable was on July 22. Marable called Turner to caution him to deal only with him or his cocaine supplier, Nora. Turner again injected heroin into the conversation when he told Marable that regardless of the outcome of the cocaine deal, he would be back in touch with Marable on the "brown stuff". Marable informed Turner that he was presently working on the "brown stuff"; that he had two connections for it; and that he could get bids if Turner was still interested. Turner replied that he was.

Off and on during the months of July and August, Cole resided at Horace Jones' house. Cole gave Horace Jones' phone number to Turner in case Turner needed to reach him. Sometime after the 19th of July, Turner phoned Cole at that number. Horace Jones answered the call and initiated a discussion with Turner about the possibility of a heroin deal. When Horace Jones confronted Cole about Turner's call, Cole said that Turner was interested in purchasing heroin. Shortly thereafter, sometime between July 22 and July 28, a three-way phone conference was carried on between Cole, Horace Jones, and Turner. Cole informed Turner that Horace Jones was his heroin source, and Turner requested Horace Jones to obtain some heroin for him.

On July 28, Turner spoke with Cole on the phone. Cole inquired if Turner had acted on the brown stuff. Turner answered that he had spoken with Marable about it and that he was waiting for Marable to fulfill his promise to work on a heroin deal.

Cole advised Turner that he and Marable were checking out a heroin source in Birmingham.

Nothing transpired until August 11. On that date Horace Jones notified Turner that "the boy" (slang for heroin) was on its way. The next day Horace Jones called Turner to tell him 27.7 grams of 11% pure "brown" was available for sale. The parties agreed that Turner could purchase a sample of the heroin for $1200 and that if Turner was satisfied with the sample, the time and price for the larger buy would be settled. As instructed, Turner proceeded to McDonald's in College Park, Georgia, where he purchased the sample of heroin from Horace Jones. On August 13, Horace Jones notified Turner that one kilo of heroin with a purchase price of $36,000 to $37,000 had been ordered for him.

Either on August 13, or August 14, Horace Jones apprised Cole, who was in Miami, that an ounce of heroin had been sold to Turner. Cole phoned Marable to relate this information and to reconfirm the earlier partnership pledge between Cole and Marable to share the profits of the drug trade.

On August 16, Horace Jones advised Cole and Douglas Jones that the heroin connection was in California and that the heroin would arrive in Atlanta in three days. Douglas Jones, brother of Horace Jones, had flown to Atlanta around August 10 supposedly for a visit with his brother Horace.

On the morning of August 20, Douglas Jones was notified that the heroin was in Atlanta. Horace Jones was in Miami so Cole and Douglas Jones went to Stouffer's Inn to pick up the heroin. Douglas Jones entered the hotel alone and returned with a large brown paper bag stuffed inside his leather shoulder satchel. Cole and Douglas Jones drove back to Horace Jones' house to weigh and to repack the heroin.

Around 11:00 a. m., Turner phoned Horace Jones' house for Cole. Douglas Jones, who had been talking to Horace Jones in Miami, answered and switched on the conference call mechanism connected to Horace's home phone. A four-way conversation was held between Douglas Jones, Horace Jones, Cole and Turner. Cole told Turner that he would be contacted within thirty minutes and would be given the number of a pay phone to call.

When Turner dialed that phone number, he was supplied with the details of the concluding chapter of the heroin transaction. Turner was instructed to check into the Hospitality Inn and wait for a phone call from Cole. The Hospitality Inn, however, had no vacancies, and Turner checked into the Century Inn instead. Turner phoned Cole and explained the situation. Cole consented to join Turner in his room in the Century Inn.

Cole, accompanied by Douglas Jones, arrived within minutes. As Douglas Jones entered the room with his leather shoulder satchel, he demanded the money. Cole told Douglas Jones that the parties had prearranged for Turner to take a sample to be analyzed and, if satisfied with the quality, to return with the purchase price of the kilo. Douglas Jones threw the satchel on the bed and told Turner to get his sample. Turner left with a sample which proved to be heroin. Instead of Turner returning with the money, however, in came the police and arrested Cole and Douglas Jones.

## MELVIN MARABLE

In light of the foregoing facts, Marable argues that the evidence was sufficient to convict him of a *cocaine* conspiracy, which the indictment did not cover, but that it was insufficient to sustain a conviction for a *heroin* conspiracy; therefore the trial court should have granted his motion for a judgment of acquittal.

■ When confronted with a motion for a judgment of acquittal, the trial judge must decide whether, viewing the evidence in a light most favorable to the government, any reasonable minded jury considering that evidence would necessarily have a reasonable doubt as to guilt. In circumstantial evidence cases, the inferences reasonably to be drawn from the evidence must not only be consistent with guilt but

inconsistent with every reasonable hypothesis of innocence.[1]

On appeal, the denial of a judgment of acquittal will be upheld if the court is satisfied that a reasonably-minded jury, considering the evidence in a view most favorable to the government, could have concluded that the evidence was consistent with guilt and, in circumstantial evidence cases, inconsistent with every reasonably hypothesis of innocence. *United States v. Edwards,* 5 Cir. 1974, 488 F.2d 1154, 1157.

To establish that Marable was guilty of conspiring, the government had to prove that a conspiracy existed; that Marable had knowledge of the existence of the conspiracy; and with that knowledge, joined it and intentionally did something to further it. *United States v. Salinas-Salinas,* 5 Cir. 1977, 555 F.2d 470; *United States v. Muller,* 5 Cir. 1977, 550 F.2d 1375; *Causey v. United States,* 5 Cir. 1965, 352 F.2d 203. In other words, the government had to present evidence showing an agreement between Marable and one or more persons to commit the illegal act of conspiring to possess with intent to distribute heroin and an overt act by Marable or any conspirator in furtherance of the conspiracy.[2]

Marable insists that there was insufficient evidence to show· an agreement between Douglas Jones, Horace Jones, Cole, and Marable; that the evidence was insufficient to show that Marable had actual knowledge of the heroin conspiracy between Cole and the Jones brothers; and that Marable took no action to further the conspiracy.

It is true that in the beginning the discussions and activities of the participants mentioned cocaine in particular but they did not stop there. The talk expanded to include heroin at the July 14 meeting in Miami when Marable, in the presence of his co-conspirator Cole, offered to check his heroin sources in order to locate a supplier for Turner. At the LaGrange meeting, also attended by Cole, Marable advised Turner that his heroin source would probably deliver in Atlanta (where the contraband was ultimately delivered) but that price, quality, and quantity would have to be settled later. During a July 22 phone conversation, Marable informed Turner that he could get bids from two heroin connections if Turner desired. On July 28, Cole via a phone call advised Turner that he and Marable were checking out a heroin source in Birmingham. During late July or early August, Horace Jones joined the Cole-Marable conspiracy. In furtherance of the conspiracy, Horace Jones sold a sample of heroin to Turner. Cole notified Marable of the sale and of the pending, bigger sale, reaffirming his intention to abide by the drug partnership pact earlier agreed to by Cole and Marable. Marable asked to be kept apprised of any developments. Subsequently, Douglas Jones joined the conspiracy, and it was through the Jones brothers and Cole that the heroin transaction was brought to fruition.

This evidence warranted an inference beyond a reasonable doubt, and even to the exclusion of every hypothesis consistent with innocence, that an agreement to distribute heroin *did exist* between Marable, Cole, Douglas Jones, and Horace Jones.[3]

---

1. *United States v. Haggins,* 5 Cir. 1977, 545 F.2d 1009; *see United States v. Reynolds,* 5 Cir. 1975, 511 F.2d 603; *United States v. James,* 5 Cir., 510 F.2d 546, *cert. denied,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975); *United States v. Warner,* 5 Cir., 441 F.2d 821, 825, *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

2. *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *United States v. Isaacs,* 5 Cir., 516 F.2d 409, *cert. denied,* 423 U.S. 936, 96 S.Ct. 295, 46 L.Ed.2d 269 (1975);

*United States v. Perez,* 5 Cir. 1973, 489 F.2d 51, 61, *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), and cases cited therein; *United States v. Jacobs,* 5 Cir. 1971, 451 F.2d 530, *cert. denied,* 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

3. *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *United States v. Amato,* 5 Cir., 495 F.2d 545, *cert. denied,* 419 U.S. 1013, 95 S.Ct. 333, 42 L.Ed.2d 286 (1974).

The existence of an agreement may be proved by "circumstantial evidence, . . . the testimony of a co-conspirator who has turned state's evidence, . . . evidence of out-of-court declarations or acts of a co-conspirator or of the defendant himself. If the totality of . . . [the] evidence . . . [adequately shows] a concert of. action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose" then an agreement coupled with an overt act, a conspiracy, may be found. *United States v. Perez,* 5 Cir. 1973, 489 F.2d 51, 61.

The testimony of Turner and of Cole established the existence of an agreement. On several occasions Turner and Marable, in the presence of Cole, discussed the sale of heroin. The testimony of Cole, a co-conspirator who turned government witness, established that Cole and Marable were seeking a heroin source for Turner and that Cole and Marable had a tacit understanding to split the profits of any drug trade. Viewed cumulatively, this fosters the conclusion that Marable and Cole were knowingly working together for the purpose of supplying Turner with heroin and, therefore, that an agreement to distribute heroin existed between Cole and Marable. The conspiracy was expanded to include Horace Jones and Douglas Jones. Horace Jones, Douglas Jones, and Cole arranged to sell one kilo of heroin to Turner. Marable did not know the details—date, place, and price, but the activities of all four accused were directed toward the accomplishment of a single goal—supplying Turner with heroin.

■ Marable's argument is that since he had no knowledge of the participation of the Jones brothers, the Cole-Jones brothers conspiracy to sell heroin was entirely distinct from the Cole-Marable conspiracy to sell cocaine. For the conspiracy between Cole and Marable to continue and to expand to include the Jones brothers, Marable's knowledge of the identity and number of participants of the conspiracy or of the de-

tails of the drug deal was not necessary.[4] Once connected to the conspiracy, and from which he had not withdrawn, Marable was responsible for any later act of a co-conspirator which was a necessary or natural consequence of the conspiracy, including the transactions with Turner, *United States v. Brasseaux,* 5 Cir. 1975, 509 F.2d 157.

■ Marable's contention that he took no act in furtherance of the conspiracy is meritless. Marable's telephone conversations and the Miami and LaGrange meetings with Turner discussing and arranging the sale of heroin were overt acts in furtherance of the conspiracy to distribute heroin. *United States v. Villarreal,* 5 Cir., 546 F.2d 1145, *cert. denied,* 431 U.S. 917, 97 S.Ct. 2181, 53 L.Ed.2d 228 (1977).

■ Marable claims that a material variance existed between the indictment and the proof. The indictment charged a single conspiracy to possess and distribute heroin with Cole, Douglas and Horace Jones, and Marable as members. Marable contends that the evidence revealed two conspiracies—a heroin conspiracy among all the defendants *except* himself and a cocaine conspiracy involving Cole and Marable but not the Jones brothers.

Our discussion of the nature and sufficiency of the evidence disposes of this contention.

Marable asserts that the district judge erred in denying his motion for severance. He attempts to show an abuse of discretion by demonstrating that the joint trial with his co-defendants prejudiced him because (1) the joint trial precluded his proffer of the exculpatory testimony of his co-defendant Horace Jones, (2) his defense and Horace Jones' defense were inconsistent, and (3) the evidence against Douglas and Horace Jones was greater than the evidence against him.

■ To obtain a severance based on a defendant's desire to call a co-defendant as

---

4. *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. Netterville,* 5 Cir. 1977, 553 F.2d 903, cert. denied, —— U.S. ——, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978).

a witness on his behalf, the defendant must prove a bona fide need for the testimony, the substance of the desired testimony, the exculpatory effect of the desired testimony, and that the co-defendant would indeed have testified at a separate trial. *United States v. Rice,* 5 Cir. 1977, 550 F.2d 1364, 1369, *cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977); *Byrd v. Wainwright,* 5 Cir. 1970, 428 F.2d 1017, 1019–22. Marable merely hinted at the substance of Horace Jones' desired testimony. He failed to show that Horace Jones would have taken the stand in a separate trial.

Before a severance will be granted due to inconsistent defenses, a defendant must demonstrate that the defenses are antagonistic to the point of being mutually exclusive. Absent clear evidence that the defenses of defendant and co-defendant will be conflicting, the denial of a motion for a severance on grounds of conflicting defense is not error. *United States v. Wilson,* 5 Cir. 1974, 500 F.2d 715, 723, *cert. denied,* 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658 (1975). As a defense, Marable denies any involvement in the heroin conspiracy. Horace Jones offered no defense. No conflict between the defenses is apparent.

Demonstrating that the evidence is stronger against a co-defendant than oneself does not satisfy the burden of showing *compelling* prejudice. *United States v. Partin,* 5 Cir. 1977, 552 F.2d 621, 641, *cert. denied,* —— U.S. ——, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

Finally, Marable argues that certain statements made by the prosecutor in the closing argument and the admission of "hearsay" evidence were so prejudicial as to deny him a fair trial. We have carefully read and evaluated the record on these points and conclude that they do not merit discussion.

During the trial, Marable's attorney, in open court, announced that he would call Horace Jones, the co-defendant, to the witness stand. At the Bench, beyond the hearing of the jury, Horace Jones' attorney objected on the ground that he was a defendant in the case and did not have to testify. Then, in the presence of the jury, the Court inquired if he correctly understood that Mr. Horace Jones declined to testify. His attorney announced that "on my advice at this time, Your Honor, I decline to allow him to take the stand". The Court then instructed the jury that Jones was a defendant in the case, that a defendant can either testify or not testify as he chooses, and that if he fails to testify the jury is not to be in any way prejudiced against him, that the jury was to decide the case on the evidence it heard and must disregard the fact that a defendant does not testify because he has a perfect right to decline to do so.

The uncontroverted testimony had revealed that Horace Jones conspired to sell and did sell an ounce of heroin to Turner. The District Court was patently correct in refusing to allow Horace Jones to be called as a witness for Marable and Marable has no room to complain of it.

## DOUGLAS JONES

The sole contention of this appellant, in which Marable joined, is that the trial court erred in declining to admit the testimony of Cole's former attorney. According to Marable's proffer, this attorney would have testified that Cole had never mentioned Marable's name to him. This, claimed Marable, would establish that Cole had perjured himself when he incriminated Marable. Jones claimed that the testimony of this attorney would impeach Cole and corroborate Jones' claim of innocence in that the attorney would testify that Cole admitted that the heroin belonged to him and that Douglas Jones had no knowledge of any heroin deal. On account of the attorney-client privilege, the Court would not permit the former attorney to testify.

We need not linger long over this point. *See, In re Grand Jury Proceedings v. Jones,* 5 Cir. 1975, 517 F.2d 666, 670; *Laughner v. United States,* 5 Cir. 1967, 373 F.2d 326; 8 Wigmore, Evidence, § 2327 (McNaughton rev. 1961).

The convictions of both Melvin Marable and Douglas Jones are

AFFIRMED.