**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gilberto GONZALEZ,
Defendant-Appellant.**

**No. 85–5514.**

United States Court of Appeals
Eleventh Circuit.

Nov. 19, 1986.

Humberto J. Aguilar, Fernandez, Fernandez & Aguilar, Miami, Fla., for Lopez.

Peter Raben, Frederick S. Robbins, Miami, Fla., for Gonzalez.

Stanley Marcus, U.S. Atty., Gary Nunes, David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for U.S.

Before FAY and JOHNSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

PER CURIAM:

In a joint trial, a jury found Anselmo Lopez and Gilberto Gonzalez guilty of knowingly and intentionally possessing with the intent to distribute cocaine in violation of 21 U.S.C. § 955c (1982) and Gilberto Gonzalez guilty of knowingly and intentionally possessing with the intent to distribute cocaine in violation of 21 U.S.C. § 955a(a) (1982). The district court sentenced Gonzalez to two fifteen year prison terms to run concurrently and imposed a fine of $5,000.00. The sole issue Gonzalez raises on appeal is whether the district court erred in denying his motions for severance. After careful review of the record, we reverse and remand for a new trial.

### I. FACTS

The facts that concern us on appeal are as follows:

On December 12, 1984, a United States Coast Guard Cutter CAPE SHOALWATER spotted the BAHAMAS TRANSPORTER, a large freighter, towing a small cabin cruiser, the JUAN CARLOS I. Approximately nine miles off the Florida coast at about 10:30 p.m. Lieutenant Robert Albright, the commanding officer of the

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

CAPE SHOALWATER made radio contact with the BAHAMAS TRANSPORTER and ascertained the nationality of the boat they were towing as a United States vessel with Florida registration numbers. Albright then brought the SHOALWATER alongside the JUAN CARLOS I and decided to board the vessel for a Coast Guard inspection to determine whether the boat complied with all federal laws and regulations. A routine inspection includes, *inter alia,* checking fire extinguishers, life preservers, a check for proper ventilation, oil in the bilges and oil in the engine compartments.

The boarding party, consisting of two petty officers, lifted the engine compartment covers and reached down to inspect the engines and the surrounding equipment. The petty officer inspecting the engine compartment found two blue boxes containing a white powdery substance.[1] Anselmo Lopez was the only person found onboard the JUAN CARLOS I. Lopez was transported over to the CAPE SHOALWATER and placed under arrest.

When the CAPE SHOALWATER approached the BAHAMAS TRANSPORTER, Lieutenant Albright instructed petty officer Daum to "pick up the owner of the JUAN CARLOS I." When the officer asked the owner of the JUAN CARLOS I to step forward, Gonzalez got onto the boat. After being transported to the CAPE SHOALWATER Gonzalez was given the *Miranda* warnings and placed under arrest.

Appellants were transported aboard the CAPE SHOALWATER to Miami, Florida and met by Mike Ricciardo, an agent associated with the Florida Joint Task Group. Lieutenant Albright introduced the two people from the JUAN CARLOS pointing out Gonzalez as the owner and Lopez as the operator. Appellant Gonzalez responded, "I don't have anything to do with that boat. I am not the owner. I don't know anything about it." Agent Ricciardo then interviewed both Lopez and Gonzalez.

At trial, Lopez testified that a customer named Carlos requested him to go to Bimini to repair the JUAN CARLOS. He would be paid $500.00 for the job. Carlos made all the travel arrangements and once in Bimini Lopez found that the propellers on the JUAN CARLOS were broken and the boat would have to be towed to Miami to be fixed. Lopez never attempted to start the engines because "the whole boat would fall apart." Lopez testified that he was in Bimini for approximately "two and one-half days, more or less," and both Carlos and Gonzalez were present. Lopez further testified that Gonzalez represented himself as the owner of the JUAN CARLOS I. When asked whether he saw any documents pertaining to ownership of this particular vessel Lopez responded that he saw Gonzalez take out the registration, tear it up and dump it in the water. Lopez stated that Carlos and Gonzalez went to the office together allegedly to rent the BAHAMAS TRANSPORTER to tow the JUAN CARLOS I to Miami. Lopez testified that while both he and Gonzalez started on board the JUAN CARLOS I, Gonzalez jumped to the tugboat so that he could watch the tow rope during the course of the trip. Lopez testified that Gonzalez instructed him to remain on board the JUAN CARLOS I to keep a leak under control by bailing out water.

Apparently as a surprise to most participants, Lopez also testified that Gonzalez had the engine key with him in jail and that he threw it between the bench and the wall of the cellblock while they were being held for a bond hearing. After Lopez testified that Gonzalez threw the key between the bench and the wall in the cellblock, the Assistant United States Attorney made a motion to reopen the government's case and for a recess asking that the Marshal take the attorney defending Lopez, himself and Agent Ricciardo to where this key was allegedly hidden. Agent Ricciardo found the key, turned toward the door and Gonza-

---

**1.** The white powdery substance was transported to the CAPE SHOALWATER where it was field tested positive for cocaine. The parties stipu-

lated the cocaine weighed 2,010 grams and was ninety-four percent pure.

lez spontaneously uttered, "The Coast Guard put that there." The key fit the ignition of the JUAN CARLOS I.

Appellant Gonzalez took the stand and testified that a "Fernando" contracted him to take approximately forty-eight quarts of oil to Bimini for which he would receive payment of one thousand dollars. Gonzalez testified that he borrowed the JUAN CARLOS I from a friend, Alfonso Majera, and Fernando operated the vessel to Bimini. He further testified that Alfonso Majera was the registered owner of the vessel. At the entrance of Bimini Harbor the boat ran aground and Gonzalez testified that arrangements were made for him to return to Miami aboard the BAHAMAS TRANSPORTER. Gonzalez testified that he was never aboard the JUAN CARLOS I on the journey back to Miami. He boarded the BAHAMAS TRANSPORTER from the inception of the trip in Bimini. Gonzalez was arrested aboard the BAHAMAS TRANSPORTER en route to Miami.

Gonzalez met Lopez for the first time in Bimini. He testified that he saw Lopez and another man put something on the boat and "something seemed suspicious." He testified that the only time he saw Lopez after the arrest was at the Metropolitan Correctional Center (MCC) where Lopez told him that he was going to implicate Gonzalez because he hadn't been given a bond, and his family had not received money. Gonzalez said that he had nothing to do with a bond for Lopez and never offered him any money to testify on his behalf. Gonzalez testified that Lopez said, "I am going to get you into trouble."

Gonzalez denied tearing up the registration and hiding the key to the vessel in the cellblock. Gonzalez testified that he gave both the key to the JUAN CARLOS I and the certificate of registration to Fernando who intended to buy the boat. Both Lopez

and Gonzalez denied having any knowledge of cocaine on board the JUAN CARLOS I.

## II. SEVERANCE

Appellant Gonzalez contends that the district court abused its discretion in denying his repeated motions for severance pursuant to Fed.R.Crim.P. 14.[2] Gonzalez argues that the mutually antagonistic defenses presented created prejudice resulting in an unfair trial. We agree.

 It is well established that persons who are jointly indicted shall be tried together. *United States v. Esle,* 743 F.2d 1465, 1476 (11th Cir.1984). This rule applies with particular force to conspiracy cases. *United States v. Alvarez,* 755 F.2d 830, 857 (11th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985). We will only reverse a district court's denial of severance under Fed.R.Crim.P. 14 for an abuse of discretion, *United States v. Magdaniel-Mora,* 746 F.2d 715, 718 (11th Cir.1984), and we are reluctant to second guess a district court's decision to deny a motion for severance. *Alvarez,* 755 F.2d at 857 (citations omitted). Rule 14 requires the district court to balance the right of defendants to a fair trial, absent the prejudice inherent in a joint trial, against the interests of judicial economy and efficiency. *United States v. Hewes,* 729 F.2d 1302, 1318 (11th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985).

 To establish an abuse of discretion, appellant "must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against which the trial court could offer no protection." *Magdaniel-Mora,* 746 F.2d at 718. (citations omitted). The standard the district court must apply in a case claiming antagonistic defenses is set forth in *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. Unit B 1981).[3]

---

**2.** Counsel for Gonzalez filed a motion for severance before trial; repeated the motion at the close of the government's case in chief, during the testimony of the co-defendant, at the close of the government's rebuttal, and before the jury retired. Each time it was denied.

**3.** Unit B decisions of the former Fifth Circuit rendered after September 30, 1981 are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

Severance of a defendant is compelled if the defenses are antagonistic and mutually exclusive. "[I]f the jury, in order to believe the core of the testimony offered on behalf of that defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant," severance is compelled. In that situation, the co-defendants "become the government's best witnesses against each other." *Id.* at 1134. "Ultimately, the test is whether the defendant received a fair trial." *Id.*

■ The record discloses that the defenses asserted by Lopez and Gonzalez were irreconcilable and mutually exclusive. Lopez incriminated Gonzalez at every opportunity. Lopez testified that he saw Gonzalez tearing up the registration for the boat. He testified that while he and Gonzalez were in the cell awaiting the bond hearing he saw Gonzalez hide the key of the JUAN CARLOS I between the bench and the wall. He later told his lawyer who told the Assistant U.S. Attorney, the Marshal and Agent Ricciardo the place that Lopez had designated and the key was retrieved. The key was offered into evidence. The gist of Lopez's defense was that Gonzalez owned and/or had control of the boat; owned the cocaine and attempted, by a bribe, to hide those facts. It is apparent that Lopez introduced the key into evidence in support of his defense theory. The jury, in order to believe the testimony offered by Lopez that Gonzalez hid the key which supported his defense that Gonzalez had control over the boat and the cocaine, had to disbelieve Gonzalez when he testified that he did not own the boat, tear up the registration or hide the key. In addition, it is clear that by offering testimony about Gonzalez hiding the engine key Lopez became the government's best witness. We find compelling prejudice from a co-defendant's defense when that defense entails presentation of this sort of evidence. *Cf., United States v. Van Horn,* 789 F.2d

1492, 1506 (11th Cir.1986) (citation omitted). (It would be unusual to find compelling prejudice from a co-defendant's defense when that defense did not entail presentation of evidence). Even though Gonzalez attempted to show that he was not culpable, under the *Berkowitz* standard, these inherently prejudicial conditions created a fundamentally unfair trial.

Appellant Gonzalez also contends that counsel for Lopez spent more time in closing argument placing blame on Gonzalez than exonerating his own client. Counsel for Lopez continually called Gonzalez a liar and urged the jury to so conclude. Lopez's attorney declared:

> ... [O]ne individual got up [there] with one purpose in mind. His [Gonzalez] only purpose was to fool you.... He was squirming. This man lied to Agent Ricciardo, lied to the Coast Guard, lied to everybody.... He's caught, and every time he's caught, he lies and lies again.

■ The government asserts that comments of counsel are not evidence and cannot be considered as such, citing *United States v. Mota,* 598 F.2d 995 (5th Cir.1979), *cert. denied,* 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).[4] This statement is technically correct. However, we hold that Lopez's counsel made the kinds of accusations under the circumstances that is sufficient to create an antagonistic defense. *See United States v. Romanello,* 726 F.2d 173, 178 (5th Cir.1984). "An accusation by counsel can state the core of his client's defense and cast blame on the co-defendant." *Id.* at 179. In this case Lopez's counsel, in effect, told the jury that Gonzalez was guilty. He stated:

> ... [Lopez] was duped by this individual and others who participated in a scheme to import cocaine into the United States, to break the laws of the United States, ... and that the owner of the cocaine was the overseer, Gilberto Gonzalez, who

---

**4.** In *Mota,* the court concluded that Mota was not prejudiced by counsel's closing argument in which he stated, "[W]hat we are here about ... is not whether there was a cocaine transaction. It is not whether or not somebody broke the

law, but whether or not somebody is guilty. Juan Flores is not guilty under the law." 598 F.2d at 1000 n. 3. We find Lopez's counsel's remarks easily distinguishable.

was sitting on the other vessel, watching his property.

We find that Lopez's counsel took an adversarial stance that generated trial conditions so prejudicial to Gonzalez as to deny him a fair trial. *United States v. Sheikh,* 654 F.2d 1057, 1066 (5th Cir. Unit A 1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). (citations omitted). The comments were proper insofar as Lopez was concerned as they were based upon evidence received during the trial. They highlight, however, the irreconcilable and antagonistic positions of Lopez and Gonzalez.

Appellant Gonzalez further asserts that he was forced to take the stand to counter Lopez's assertions. The government contends that the testimony Lopez provided at trial would have been offered by the government in any subsequent trial of Gonzalez. In *United States v. Andrews,* 765 F.2d 1491 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986), the court stated that since evidence would most likely have been offered in a separate trial, appellant did not appear to have been prejudiced from the joint trial. *Id.* at 1498. The statements made in *Andrews,* however, related almost exclusively to presence at an encounter, a seemingly peripheral matter. The statements in *Andrews* did not indicate a knowing participation in any incriminating transaction. In this case, Lopez's statements were extremely inculpatory against Gonzalez and there is no way to predict whether a separate trial would be different. Each case must be evaluated based upon the peculiar facts presented. Under these specific circumstances, we conclude Gonzalez should have been afforded a separate trial.

### III. CONCLUSION

A severance of Gonzalez's case was required under these particular circumstanc-

es. There were only two defendants, the evidence was uncomplicated and it would neither have been too time consuming nor impracticable to have two separate trials. "Although the evidence of each defendant's individual guilt was strong, this joint trial was intrinsically prejudicial." *United States v. Crawford,* 581 F.2d 489, 492 (5th Cir.1978).[5] Fundamental fairness is our paramount concern; we therefore REVERSE Gonzalez's conviction and REMAND for a new trial.

WALTER E. HOFFMAN, Senior District Judge, dissenting.

The majority has found the defenses of Lopez[1] and Gonzalez to be antagonistic and mutually exclusive, thus second-guessing the district court's denial of Gonzalez' motion to sever which, as all authorities reflect, is a decision committed to the sound discretion of the district court. I respectfully dissent. The decision of the majority will open the door to a flood of severance motions based upon testimony which conflicts, but in largely peripheral matters which are not at the core of the defense of either or both of the defendants.

The *core* of the defenses of both Lopez and Gonzalez was that neither defendant knew anything about the two blue boxes containing cocaine which were discovered by the Coast Guard during the late night hours of December 12, 1984, under the port engine of the JUAN CARLOS I. The defendants, according to their versions, traveled separately from Miami to Bimini; a voyage requiring slightly less than three hours. Their testimony was to the effect that they did not know each other prior to their arrivals at Bimini. Carlos, whose full name is otherwise unknown, took Lopez to Bimini in one boat to repair two other boats; one it later developed was the

---

5. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

1. Lopez was convicted of the conspiracy charge, Count I, but the jury returned a not guilty verdict on Count II. The appeal of Lopez was summarily denied and the judgment of conviction was affirmed under Rule 25 of this Court. Lopez did not move for a severance, either before or during the trial.

JUAN CARLOS I which, in the opinion of Lopez, could not be repaired at Bimini; the other boat was repaired at its location. Gonzalez, on the other hand, was persuaded by a millionaire known as Fernando, whose full name is otherwise unknown but whose nickname was Rapido, to take the JUAN CARLOS I to Bimini to deliver a relatively small quantity of oil at Bimini for the sum of $1,000 for Gonzalez' services and incidental expenses. Near the entrance to Bimini the JUAN CARLOS I was damaged when Fernando, the operator, encountered some rocks. Gonzalez, according to his testimony, had been told by the registered owner of the JUAN CARLOS I, Alfonso Majera,[2] that he, Majera, wanted to sell the boat and that, since Majera was "a friend of mine," [3] Gonzalez knew that he could use it for the trip to Bimini with the unknown Fernando who carries the nickname "Rapido" or "El Rapido." [4]

After it became apparent that the JUAN CARLOS I could not be repaired in Bimini, it is the contention of each defendant that each was left stranded in Bimini; Lopez was stranded by the otherwise unknown "Carlos"; Gonzalez was left stranded by the otherwise unknown "Fernando." [5] Neither "Carlos" nor "Fernando" accompanied the defendants on the return trip to Miami.

The record shows that, at no time, did Lopez state or suggest that Gonzalez was the owner, or at any time had the possession, of the two blue boxes containing the cocaine. As far as Lopez was concerned, Gonzalez had no connection with the cocaine, although he did state that Gonzalez represented himself as the owner of the boat. As to Gonzalez, he likewise did not testify that Lopez had anything to do with the cocaine, although he did state that, approximately one-half hour before the BAHAMA TRANSPORTER departed Bimini with the JUAN CARLOS I in tow, he saw Lopez and an unidentified man go aboard the JUAN CARLOS I with the man carrying a package and, when they left the boat, neither Lopez nor the man had the package. This is apparently what Gonzalez referred to as "something seemed suspicious." In any event, Gonzalez cannot claim the benefit of an antagonistic and mutually exclusive defense testimony created by him at the time of trial.

As in *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. Unit B, 1981), "the essence or core of each defendant's defense—noninvolvement in the criminal activity—was not in conflict, and indeed could be construed to be quite consistent, i.e., neither was criminally involved." *Id.* at 1134. In *Berkowitz*, the court relies in part upon *United States v. Sheikh*, 654 F.2d 1057, 1065 (5th Cir.1981) (also cited in majority opinion herein), which is very much in point with the facts in the instant case. In *Sheikh*, as recited in *Berkowitz*, the court said:

> [T]he appellant and a co-defendant both contended that they had no knowledge that heroin was hidden in a Koran display case that each had possessed. The appellant and the co-defendant, however, each claimed that the other was the owner of the case. The court held that, while with respect to ownership of the case the two defenses were so antago-

---

**2.** The title papers of the JUAN CARLOS I revealed that Majera was, at that time, the registered owner. The owner prior to Majera was "Gilberto Gonzalez," bearing the same name as the defendant, but defendant denied ever having any ownership of the vessel and the Government never proved to the contrary.

**3.** Vol. III, p. 231. Majera was not called to testify as a witness. Agent Ricciardo obtained an address for Alfonso Majera, a resident of Dade County, Florida, but he was apparently not subpoenaed by any party.

**4.** Vol. III, p. 243. Fernando, also known as "Rapido" or "El Rapido," did not testify as a

witness. According to Gonzalez, Fernando was a millionaire, Vol. III, p. 233. It is difficult to believe that a millionaire such as Fernando, who drove a Mercedes convertible 450, could not be located in the general Miami area.

**5.** When Gonzalez was interviewed by Michael Ricciardo, a United States Customs Service officer assigned to the Florida Joint Task Force, Gonzalez denied knowing "anything about the boat" [JUAN CARLOS I], Vol. II, pp. 92, 93, and did not refer to "Fernando" other than by a nickname "Rapido" or "El Rapido."

nistic as to be irreconcilable and mutually exclusive, the "essence" or "crux" of the defenses were not antagonistic, and thus neither defendant suffered the compelling prejudice that would require severance.

While neither Lopez nor Gonzalez ever claimed that Lopez was the owner of the JUAN CARLOS I, Lopez was admittedly the "operator" on the return voyage to Miami and, in this respect, he was in the nature of an owner for the time being. Unless this circuit is disposed to disregard *Sheikh*, as interpreted by the later *Berkowitz* opinion, I cannot agree with my colleagues that we are confronted with a "core" defense.

The majority also relies upon *United States v. Crawford*, 581 F.2d 489 (5th Cir. 1978) (binding on the 11th Circuit), as authority to support its conclusion to reverse the instant case. In *Crawford*, one Blanks was driving an automobile with Crawford as a passenger. Blanks was recognized by the officers as a person not having a driver's license, and stopped the vehicle. The arresting officers found a sawed-off shotgun partially hidden under the dash. Both Blanks and Crawford were jointly charged with the possession of an unregistered sawed-off shotgun. Each defendant sought a separate trial which was denied. At trial, Blanks testified that Crawford owned the firearm and presented witnesses who supported that testimony. Crawford, on the other hand, claimed that Blanks was the owner and that he, Crawford, had not seen the shotgun before the night of the arrest. The *Crawford* case involved a true, typical, "core" defense, where the sole defense was the guilt of the other defendant. Even though there is much to be said in favor of Judge Clark's dissent in *Crawford*, I agree with the majority in that case as the factual situation demonstrated clearly that the defenses asserted by each defendant were obviously antagonistic and mutually exclusive. However, that is not

this case where neither defendant points the finger at the other as to either the possession or ownership of the cocaine.

In the present case the jury was not required to convict both defendants, nor was it mandated by the evidence to convict one and acquit the other. They had several alternatives: first, the jury could conclude, as it did, that the two defendants conspired to knowingly and intentionally possess with intent to distribute cocaine in violation of 21 U.S.C. § 955c, and thus find both defendants guilty on the conspiracy count; second, the jury could conclude that the Government had failed to meet the burden of proof imposed upon it by law, and find both defendants not guilty (although it is unlikely that the evidence would support a verdict against one defendant, and not against the other defendant, the conspiracy count refers to a possible conspiracy in that the named defendants did "agree with each other *and with persons unknown* [6] to the Grand Jury"); third, on the substantive count (Count II), the jury could acquit or convict both defendants, or find one guilty and the other not guilty as it did in fact do. As stated in *Berkowitz*, at 1134:

> Although the defendants concededly disagree on some details, neither defendant's defense required the jury to find the other guilty. Nor was it necessary for the jury, in order to believe the core of testimony offered on behalf of one defendant, to disbelieve testimony offered on behalf of the other defendant.

Since the *core* of testimony with respect to each defendant is the same, i.e., a complete lack of knowledge of any criminal activity on the part of anyone, and since the standard for mutual exclusivity as given in *United States v. Romanello*, 726 F.2d 173, 177 (5th Cir.1984) (not binding on 11th Cir.), is:

> The essence or core of the defense must be in conflict such that the jury, in order to believe the core of one defense, must

---

6. In *United States v. Sheikh*, 654 F.2d 1057, 1062 (5th Cir. Unit A, 1981), the Court reversed a conspiracy conviction against one defendant, where the other two defendants had been found

not guilty, because there was insufficient evidence of the existence of any "unnamed, unindicted coconspirator."

necessarily disbelieve the core of the other

it is my conclusion that the majority has extended the rule of mutually antagonistic defenses too far in reaching out for details in the testimony presented, which details have no direct effect upon either the conspiracy charge or the substantive count. True, some of the evidence may have been more prejudicial to Gonzalez than to Lopez—all evidence is probably prejudicial to one side or the other—but this is not the test for determining whether a severance is mandated. I predict that, if the majority opinion becomes the law in the Eleventh Circuit, many district courts will feel compelled to grant severances, especially in conspiracy cases.

The incident involving the discovery of the ignition key for one of the engines on the JUAN CARLOS I came to light just prior to the conclusion of the testimony of Lopez. Had Gonzalez admitted his prior possession of the key, it would have been no surprise to anyone as he admitted that he and Fernando brought the JUAN CARLOS I from Miami to Bimini. The same is true as to the registration for the boat except that the tearing up of the registration card carried with it some evidence of possible guilt with respect to the cocaine. By his own denial relating to the registration, and his attempt to place the blame on the Coast Guard as to the placing of the key to the engine in the cellblock, Gonzalez did create a strong suspicion of guilt, but this is a far cry from an antagonistic and mutually exclusive defense.

While it is apparent that the two defendants, Lopez and Gonzalez, disagree on several details of what occurred after the arrest, neither defendant's defense required the jury to find the other guilty, *Berkowitz*, at 1134. This is *not* a case where the

essence of one defendant's defense is contradicted by a co-defendant's defense, in which the latter defense can be said to "preempt" the former, *United States v. Swanson*, 572 F.2d 523, 529 (5th Cir.), *cert. denied*, 439 U.S. 849, 99 S.Ct. 152, 58 L.Ed.2d 152 (1978) (holding that no severance was required because the defense of noninvolvement did not "preempt" a defense of lack of intent).

That the acts as testified to by Lopez, especially the claimed destruction of the boat registration card and the concealment of the boat's ignition key, all occurring after the arrests, may well have demonstrated that the evidence was stronger against Gonzalez than Lopez "does not satisfy the burden of showing *compelling* prejudice." *United States v. Marable*, 574 F.2d 224, 231 (5th Cir.1978) (emphasis in original) (cited with approval in *Berkowitz*, at 1135, note 8).

The majority relies, in part, upon the comments of counsel for Lopez in his final argument to the jury.[7] It is true that, at least in part, counsel for Lopez accused Gonzalez of being the owner of the cocaine, thus striking the core of the defense. When counsel for Lopez made this accusation, counsel for Gonzalez objected to that part of the argument and the objection was *sustained* by the trial judge. Now, however, the majority relies upon this improper argument [8] by counsel for Lopez, to which an objection was interposed and sustained, and no cautionary instruction was requested.

It is very difficult for a trial judge to control the final argument of counsel unless an objection is interposed. Statements by counsel that a witness or co-defendant has lied are not uncommon experiences. Such accusations frequently rebound against the person making same, and the final result is too speculative to forecast.

---

7. The court charged the jury in the customary manner by saying that "statements, objections or arguments by the lawyers are not evidence in the case."

8. The majority, in referring to the argument of counsel for Lopez, states: "The comments were proper insofar as Lopez was concerned as they

are based upon evidence received during the trial. They highlight, however, the irreconcilable and antagonistic positions of Lopez and Gonzalez." Presumably, the majority is referring to counsel's accusation that Gonzalez was the owner of the cocaine, to which the objection was sustained.

There was no objection interposed to counsel's statement that Gonzalez had "lied" and the court never had the opportunity to take any action.

Finally, I argue that a separate trial would bring the same result. The Government will be able to use the testimony of Lopez given in the present case, even if Lopez is dead, or under some theory may decline to testify. Rule 804, F.R.Ev. I see no need to grant a new trial to Gonzalez.

Differing with my learned colleagues, I would affirm the judgment of conviction as to Gonzalez, as I have already done so with respect to Lopez in his Rule 25 disposition.